JOHN M. LOSTUTTER and ROBERT K. LOSTUTTER, SR., *Appellants*, v. THE ESTATE OF WILLIAM A. LARKIN a/k/a W. A. LARKIN, and THE EMPORIA STATE BANK & TRUST CO., AS TRUSTEE OF THE W. A. LARKIN REVOCABLE TRUST dated September 12, 1968, including all amendments thereto, *Appellees*.

(679 P.2d 181)

Opinion filed March 24, 1984.

*John M. Lostutter,* of Kansas City, argued the cause pro se and was on the briefs for appellants.

*Richard C. Hite,* of Kahrs, Nelson, Fanning, Hite & Kellogg, of Wichita, argued the cause and was on the brief for appellee Emporia State Bank & Trust Company, Trustee of the W. A. Larkin Revocable Trust.

*J. Stan Sexton,* of Hampton, Royce, Engleman & Nelson, of Salina, argued the cause and was on the brief for appellee Emporia State Bank & Trust Company, Executor of the Estate of W. A. Larkin, deceased.

The opinion of the court was delivered by

HERD, J.: This is a consolidated action by John M. Lostutter and Robert K. Lostutter, Sr., to enforce the provisions of an oral contract against the Estate of William A. Larkin, deceased, and the W. A. Larkin Revocable Trust. This appeal is from judgment for the estate. We affirm.

William Larkin lived a successful life in Emporia, having overcome the early loss of his parents. At his death, he left a combined probate and trust estate of three million dollars. The appellants, John M. and Robert K. Lostutter, Sr., allege they are each entitled to one-half of the probate and trust estate pursuant to an oral agreement with William A. Larkin and his wife Esther, made December 25, 1946.

William A. Larkin was born on September 10, 1890, in Caldwell. He was adopted and raised by an aunt and uncle. In 1910, Larkin moved to Emporia where he obtained employment with a local bank. He married Esther Wilhite in 1914. Esther Wilhite had a sister, Florine, who married Frank Lostutter in 1910. Esther and Florine were the daughters of O. M. Wilhite of Emporia. John M. Lostutter and Robert K. Lostutter, Sr., are the sons of Frank and Florine Lostutter and hence nephews by blood of Esther Larkin. The Larkins had no children.

In 1914, after their marriage, the Larkins moved into a house which they built at 1513 Rural Street, Emporia. The Frank Lostutters built a home in 1913 at 1605 Rural Street, and in the same year O. M. Wilhite built a home at 1701 Rural Street. Florine Lostutter continued to live in the Lostutter home until August, 1977, when she moved to a house in Emporia owned by John M. Lostutter. The Larkin family home always remained at 1513 Rural Street. Robert K. Lostutter, Sr., has always lived in Emporia near the Larkin home.

After Larkin's marriage to Esther, he obtained a bookkeeping position with the Warren Mortgage Company of Emporia. The

Warren Company was engaged in making farm loans. Larkin subsequently became vice-president of the Warren Mortgage Company. After World War II, the company changed operations and began selling mutual funds and insurance until it closed in the 1960's. Larkin retired in the mid-1950's when he was sixty-four years old.

John Lostutter, after graduating from the University of Kansas Law School in the late 1930's, obtained a position with the Internal Revenue Service in Washington, D.C., in the Estate and Gift Tax Division. During World War II he served as an Ensign in the U.S. Navy. After leaving the U.S. Navy in 1946, John returned to the I.R.S. He served in the Chicago and Los Angeles offices until 1952.

In an April, 1951, visit to Emporia, John was allegedly told by William A. Larkin he wished him to obtain a position close to Emporia so he would be available to provide investment advice at more frequent intervals. John was thereafter transferred by the I.R.S. to Kansas City, Missouri.

In recent years, John has practiced law in Kansas City, Kansas, and frequently has served as a judge pro tem in the Wyandotte County District Court.

Robert Lostutter, Sr., went to work for the Santa Fe Railroad in 1937, and, except for military service with the U.S. Army between 1944 and 1946, he was employed by that company continuously until his retirement as a conductor in 1972. Since his retirement, Robert has owned and operated a liquor store in Emporia.

For some years John and Robert have also owned and managed a family agricultural operation consisting of about four thousand acres, located in the Emporia area. Their operation is only a short distance from the farm which was owned by William A. Larkin.

The Lostutters contend that on Christmas Day, 1946, William A. Larkin and Esther Larkin entered into an oral agreement with them. Pursuant to the contract John and Robert Sr., were to provide love, affection, entertainment, comfort, companionship, care, maintenance, and advice, in consideration for which William A. Larkin and Esther Larkin agreed to give, devise and bequeath to the appellants all of their property then owned or thereafter acquired.

Over the next thirty-five years, John and Robert, Sr., claim they rendered services to William and Esther Larkin consisting of visits to the Larkins, either by home visit or by telephone. The visits were frequent and lasted from minutes to hours. This claim was corroborated by friends and neighbors of the Larkins. During hospital stays, the Lostutters would arrange for the admittance and dismissal of the Larkins. Often they would stay with them and visit with them during their hospital stays. During the holidays, the Larkins would always be entertained in the homes of the appellants. There were many other occasions in which the appellants would entertain the Larkins with picnics and outings.

William A. Larkin was taken on automobile trips with the appellants to inspect and transact necessary business in connection with his farm real estate holdings in several counties around Emporia.

John Lostutter allegedly provided continuing and regular advice and counsel concerning tax laws, as well as extensive estate planning advice for William Larkin. John claims to have provided Larkin with top quality and unique information on tax matters, due to his position with the I.R.S. John also asserts he provided substantial investment advice due to his exceptional experience in investments.

Esther Larkin died on November 30, 1977, and by the terms of her will she bequeathed her property to the children of the Lostutters. William A. Larkin died on November 12, 1981. His will, dated May 11, 1977, with two codicils, dated January 26, 1978, and May 9, 1980, was admitted to probate in Lyon County, Kansas, on December 18, 1981. The estimated value of the probate estate was nine hundred thousand dollars. Appellants discovered in 1981 after Larkin's death, that William A. Larkin also had created a revocable trust on September 12, 1968. The chief beneficiary of the trust was St. Francis Boys' Home in Salina. The Lostutters were omitted from both the will and the trust.

Witnesses for the appellees refuted the testimony of appellants. Howard Gunkel, executive vice-president and trust officer of Emporia State Bank and Trust Company, the executor, reviewed all of Larkin's books, records, and documents at Larkin's home. Gunkel found no writing evidencing the contract with appellants.

Gunkel testified that after Larkin created the trust in 1968, he received detailed written instructions from Larkin regarding the proper management of the trust. The instructions provided all farm and commercial leases were to be in writing. Larkin often gave Gunkel written directions on other matters relating to the trust.

Roland Bowers, a tenant on Larkin's farm for over forty years, testified Larkin always insisted on having a written farm lease and there was not a year between 1942 and 1981 that a new written annual lease was not entered into.

In addition to his business interest and activities with Emporia State University Endowment Association and civic organizations, Larkin was very active in the St. Andrews Episcopal Church. Records of his parish reflect his marriage to Esther in the church on May 19, 1914; his confirmation in the church on November 25, 1914; and sixty-seven years of service on various church boards and groups during his adult life. Larkin was a member of the church governing board; senior warden for forty years; treasurer for a number of years and chairman of the church's building committee.

Larkin and his wife Esther were close friends of Rev. R. H. Mize and his family through their association in the church. Rev. Mize was Esther's confirmation sponsor and officiated at their marriage. Rev. Mize had two sons, Edward and Robert H. Mize, Jr. Robert was born while his father was rector at St. Andrews.

Robert Mize, Jr., founded St. Francis Boys' Homes in 1945 with the assistance of friends in Atchison, Emporia, Salina and Topeka. He purchased the former Old Peoples' Home of Ellsworth County and he and a few boys converted it into the first St. Francis Boys' Home. An additional Boys' Home was opened in Saline County shortly after the first home opened in Ellsworth County. In 1965 Mize opened another St. Francis Boys' Home in New York State. Robert Mize's original thought in opening the homes was to help in the reeducation of wayward boys. He wanted to make it possible for the boys to associate with normal boys and girls by entering them in the local public schools while they lived in the homes for psychiatric care and counseling. The current St. Francis Boys' Homes are accredited by the Joint Commission on Accreditation on Hospitals as hospital facilities.

Records at St. Francis Boys' Homes reflect Larkin was a

contributor each year from 1946 until 1979. He was on the mailing list to receive all newsletters and case history reports which reflected seventy-eight percent of the boys in St. Francis Boys' Homes programs are permanently rehabilitated by their experience at St. Francis.

In 1977, Larkin made a gift of thirty-four acres of land located north of Emporia to St. Francis Boys' Homes. The director of the Homes testified Larkin took him to the property and told him he would like for a boys' home to be built on the site, just like the one he had seen in Salina.

William Larkin had a potent reason for his interest in the boys' home. He had been orphaned at the age of four. He nonetheless became a successful businessman and civic leader, persevering on his own. Fern Clever, a grandniece of Larkin, testified both her uncle and his sister, who was Fern's mother-in-law, were "overly conscious of being left orphans when they were small." A family friend and frequent visitor to the Larkin home since 1962, Bobby Jo Dehler, testified Larkin was very interested in young adults.

Jim Meyer, assistant to the president at Emporia State University testified of his relationship with Larkin through the Emporia State University Endowment Association. Meyer was secretary and Larkin was president, chairman of the board, and after 1979, chairman emeritus of the association. In 1976, Larkin apologetically expressed to Meyer the hope that Meyer would not be upset with him because Emporia State University was not going to be the major beneficiary of his estate. Meyer testified:

"He said that he was an orphan, he grew up as an orphan; and when he told me, that was the first time I had ever realized that, and that he wanted to do something very significant for young men that were in the same situation that he was in growing up."

Fern Clever, the wife of Larkin's nephew, Bill Clever, testified it was common knowledge in the family that Larkin would leave his property to charity. She told of a conversation in 1941 when Larkin brought a housewarming gift to the Clevers. Larkin said: "Bill, you do it on your own—you're doing fine—because Esther and I will leave whatever we accumulate to charity . . . ."

Leroy Raynolds, an Emporia attorney who represented the Warren Mortgage Company, had known Mr. Larkin since 1943

and had rendered legal services to him since 1952. He had prepared wills for both Larkins in 1952, 1956 and 1961. Each time they consented to the other's will. Raynolds' records showed he prepared two additional wills for William Larkin in 1964 and 1972. The 1964 will made specific bequests to St. Andrew's Episcopal Church of Emporia, Emporia State University Endowment Association, St. Francis Boys' Home and the residue to the American Cancer Society. The 1972 will provided for bequests to St. Francis Boys' Home and the Endowment Association. The church and American Cancer Society were excluded. The 1964 and 1972 estate plans were consistent with that exemplified in the previous wills. In none of the wills did William Larkin devise or bequeath any property to the Lostutters.

James W. Putnam, another Emporia attorney, testified he met Will Larkin through common business interests in the Emporia State Bank and Trust Company. Both served on the trust committee of the Bank, Larkin as chairman and Putnam as a member. After the Bank obtained trust powers, Putnam, at Larkin's request, prepared the revocable trust together with its amendments. In preparing these documents, Putnam testified there was no discussion about beneficiaries or Larkin's intended testamentary plan. Rather, "He told me what he wanted done and I put it in legal form and he executed it."

Robert Symmonds, another Emporia lawyer and former trust officer at Emporia State Bank & Trust Company, testified he prepared Larkin's last will and testament and its first codicil. Symmonds testified Larkin asked him to draft a will and gave him the necessary instructions.

In 1978, Larkin advised Symmonds of changes he wished to make in his will. Primarily, he wanted to make a provision leaving Fern Clever $25,000. At this conference, Symmonds asked Larkin if there were any other relatives he wanted to make a provision for—specifically Bob Lostutter. Larkin replied the Lostutters were Esther's relatives, not his. In no conversation or conference with Symmonds did Larkin ever mention the existence of a contract with appellants.

Shortly after Mr. Larkin's death Gunkel was asked by Robert Lostutter to arrange for a reading of the will. On November 14, 1981, at a memorial service held for Larkin in Emporia, John

Lostutter introduced himself to Gunkel. He advised Gunkel he was to be the attorney for the Larkin estate. Gunkel had never met John Lostutter prior to this occasion. At the reading of the will John Lostutter became very upset that he and his brother, Robert Lostutter, were not beneficiaries. James Putnam testified John Lostutter arose in anger and yelled, "That Salina boys' home got to him. That's undue influence. We'll see you in court."

After the reading of the will, a second meeting was held at John Lostutter's request. Fern Clever testified this meeting ended with John Lostutter stating, "[T]he will was an 'asinine will', and he also said that charity was fine or wonderful but that this was ridiculous and that 'we'll do something about the will.' "

Evidence also showed William Larkin sought and used the advice of several attorneys and accountants in Emporia. Larkin specifically sought and paid for tax advice. Between March of 1979 and June of 1981, he also paid for the services of a live-in private duty nurse. After the nurse's employment was terminated, he moved into a rest home in Emporia. The trust paid a substantial sum for Mr. Larkin's around-the-clock care from June 1, 1981, to his death on November 12, 1981. Additionally, several friends and neighbors provided a variety of services, without expectation of compensation. Neighbors fixed him lunches, ran errands for him, purchased his groceries, and even spent nights with him when he was afraid to be alone. One neighbor, Marie Markowitz, testified Larkin could not stand to be indebted to anyone. He would carefully reimburse her to the penny for groceries she bought for him but would never overpay her.

The appellants filed petitions on January 4, 1982, contesting the Larkin will. After initially attempting to include claims against the trustee in the demands filed against the executor, appellants filed a Chapter 60 suit against the trustee on October 1, 1982. The cases were consolidated for trial. On motion of the trustee, the trial court granted summary judgment on all of appellants' contentions against the trustee except the quasi contract claim for services rendered. The trial court reserved ruling thereon until after presentation of appellants' evidence. At the conclusion of appellants' evidence, the trustee renewed its motion for summary judgment, and it was granted. The executor then proceeded with the presentation of its evidence. The case

was presented to an advisory jury. It found appellants failed to prove the existence of a contract with the Larkins. The trial court adopted the advisory jury's verdict.

The first issue is whether the trial court erred in finding there was no contract express, oral, implied in fact or implied in law. The basis of the Lostutters' case is that on December 25, 1946, an oral contract was entered into with William and Esther Larkin whereby the Larkins agreed to leave all of their property "then owned and thereafter acquired" to appellants. In consideration for this contract, appellants were to provide "love, affection, filial attention, entertainment, comfort, companionship, care, maintenance and advice" for the rest of William and Esther Larkin's lives. The evidence showed appellants provided such services over the years. The appellants assert their services were not intended to be gratuitous; that if at any time they had any idea they were not to be the beneficiaries of William A. Larkin's property, they would have severed all connections with him forthwith. They fortify their argument by alleging Esther Larkin performed her part of the contract when she bequeathed portions of her property to the children of appellants. Thus, they claim only William Larkin breached the contract. Despite this evidence, there was substantial testimony by other witnesses to refute the existence of the contract. Other witnesses testified that if there had been an agreement, the appellants had not performed their part. To support this there was evidence Mr. Larkin paid for and received tax, accounting, business and legal advice from sources other than appellants, as well as home care. Other witnesses testified they performed many services gratuitously without expectation of compensation. The trial court found there was no contract.

The scope of appellate review of a trial court's findings of fact is too familiar to require citation of authority. We have repeatedly held a trial court's factual findings will not be upset by this court if there is any substantial competent evidence to support it, even though controverted. That general rule fits this case with one exception. The findings are more difficult to overcome when, as here, the trial court's finding of fact is negative. In *Highland Lumber Co., Inc. v. Knudson*, 219 Kan. 366, Syl. ¶ 5, 548 P.2d 719 (1976), we stated a negative finding by a trial court signifies the failure of the party upon whom the burden of proof

was cast to sustain it. Absent an arbitrary disregard of undisputed evidence or some extrinsic consideration such as bias, passion or prejudice, the findings of fact of the trial court will not be disturbed.

Here we have no contention the trial court findings were tainted in any way with bias, passion or prejudice. This leaves the only remaining consideration for this court of whether the trial court arbitrarily disregarded undisputed evidence. While the record reveals a course of conduct providing care and attention by appellants to the Larkins, it does not provide undisputed evidence their attention was based upon contract rather than gratuitous acts of love, affection and family ties, as is presumed in such cases. Therefore, while the Lostutters' attention to the Larkins' lives is commendable, absent arbitrary disregard of undisputed evidence of a contract we are barred from disturbing the trial court's ruling. We so hold.

The appellants further contend the trial court erred by requiring them to prove the existence of the contract by clear and convincing evidence, rather than a mere preponderance of the evidence, citing *Hoyer v. Cannedy,* 4 Kan. App. 2d 228, 604 P.2d 76 (1979). In *Hoyer* a daughter provided household help and personal care for her mother who was partially incapacitated while recuperating from an accident-caused back injury. The trial court found a contract in fact for compensation for the daughter's services was proven by a preponderance of the evidence. On appeal, it was argued the correct standard is that of proof by clear and convincing evidence, a much higher standard to meet. The Court of Appeals found the trial court did not err since the evidence was clear and convincing.

*Hoyer* does not support appellants' claim of error. Rather, it is supportive of the trial court's ruling requiring proof by clear and convincing evidence. Further, it is important to note that in *Hoyer,* the contracting parties were both alive and available to testify, while in the case of a will contest, where one party to an alleged contract is deceased, we have recognized the need for a higher standard of proof. In *Jones v. Estate of Cooper,* 216 Kan. 764, 766, 533 P.2d 1273 (1975), this court stated:

"In an action for specific performance of an oral contract with a person since deceased, the contract must be established by evidence that is clear and convincing.

. . . .

"It is not sufficient that the existence of a contract be shown by a preponderance of evidence. This strict requirement is based upon the inherent danger of fraud in claims against the estates of deceased persons."

The trial court did not err in requiring proof by clear and convincing evidence.

The appellants next argue five areas of the instructions given to the advisory jury were clearly erroneous. Although appellants failed to object contemporaneously to the instructions, they contend they had no opportunity to interpose their objections outside the presence of the jury. The record discloses an instruction conference was conducted by the trial court outside of the hearing of the jury. Appellants' counsel made no objection to the final instructions presented to the parties at that time. Under K.S.A. 60-251(*b*), no party may assign as error the giving or failure to give an instruction unless he or she objects thereto before the jury retires to consider its verdict. The objection when given must distinctly state the matter to which the party objects and the grounds for the objection unless the instruction is clearly erroneous. See also *State v. Stafford,* 223 Kan. 62, 573 P.2d 970 (1977). Thus, appellants must show the instructions were clearly erroneous to overcome their failure to object. Here the jury was merely advisory with no binding effect on the trial court. See *Grannell v. Wakefield,* 172 Kan. 685, Syl. ¶ 1, 242 P.2d 1075 (1952). Thus, instructions to it could not be clearly erroneous since any error would be harmless.

Appellants next argue the trial court erred in granting summary judgment on all allegations against the trust and trustee, since discovery was not complete and there were material facts in dispute. They also maintain the granting of summary judgment in the case against the trustee prejudiced the case against the executor, which went to trial.

We have repeatedly stated that summary judgment is proper only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Zehring v. Wickham,* 232 Kan. 704, Syl. ¶ 1, 658 P.2d 1004 (1983). The facts which appellants claim are disputed in this case were presented in affidavits by appellants. These include statements that both appellants "faithfully and completely" performed their part of

the agreement; that their services were "exceptional and unique"; and the Larkins "accepted without question or reservation all services performed by John M. Lostutter and/or Robert K. Lostutter, Sr." These are not controverted material facts but rather allegations concerning broad legal conclusions. Additionally, they are immaterial to the issue of whether the alleged agreement permitted William Larkin to give his property to a trust. Neither appellant presented evidence that the alleged agreement precluded trust arrangements. Thus, without evidence controverting Larkin's ability to establish the trust, the trustee was entitled to judgment as a matter of law.

Appellants also claim summary judgment was improper since discovery was not complete. We have stated that ordinarily a motion for summary judgment should not be sustained so long as discovery is incomplete. See *Citizens State Bank v. Gilmore,* 226 Kan. 662, 664, 603 P.2d 605 (1979). The incomplete discovery in this case consisted merely of a deposition of Robert Lostutter which was completed but had not been thoroughly corrected at the time of the hearing on the summary judgment motion.

Robert Lostutter's deposition was taken on January 3, 1983, and was signed, corrected and filed before February 19, 1983. Subsequently, it was discovered several questions and answers had been omitted from the transcript. The transcript was then retyped. Robert Lostutter made additional corrections and it was filed a second time on April 19, 1983. The hearing on the summary judgment motion was held on April 8, 1983. While summary judgment is not proper until discovery is complete, any incomplete discovery must be relevant to the grounds for granting summary judgment. Here it was not. The facts relied upon for granting summary judgment were uncontroverted facts. Although they contained testimony of Robert Lostutter, the uncontroverted facts relied upon were not changed by the corrections filed after the hearing. Thus, the fact the deposition transcript was not complete was irrelevant.

Appellants assert the granting of summary judgment in favor of the trustee prejudiced their case against the executor, which went to trial a short time later. For support of this prejudice, articles concerning the case from the Emporia newspaper are cited.

There is no evidence the jurors were prejudiced or disre-

garded their oaths of impartiality. They were admonished specifically by the court concerning the trial publicity. There is no evidence they ignored the court's order. The newspaper articles are factual and unbiased. The appellants failed to show any animosity in the community which prevented them from obtaining a fair trial. At a hearing on a separate motion, appellants raised the issue of a change of venue. The trial judge denied the change since there was no written motion and request for a hearing. The court indicated it would hear the motion if proper procedures were followed. Appellants never carried through with the court's invitation to file the motion. A trial judge is not required to keep a party in a case when it is entitled to summary judgment, merely because the judgment might receive media coverage. There is no prejudice demonstrated which indicates the granting of the summary judgment to the trustee was improper. This issue is without merit.

The final issue raised by appellants is that they are entitled to a payment for executing the interment authorization of William Larkin. This document serves as authorization to inter Mr. Larkin as well as a hold harmless agreement by the cemetery whereby appellants agreed to indemnify the cemetery for any causes of action arising out of the authorization. Appellants set a $1000 value on their services pursuant to the authorization.

This claim was not asserted at trial and is raised for the first time on appeal. It is a well recognized concept of appellate procedure that a point not raised before the trial court may not be raised for the first time on appeal. See *Lantz v. City of Lawrence,* 232 Kan. 492, 500, 657 P.2d 539 (1983). This issue is not before us on appeal and therefore will not be entertained.

The judgment of the trial court is affirmed.