No. 65,629

RICHARD VIRGIL BROWN, *Appellee/Cross-Appellant,* v. UNITED METHODIST HOMES FOR THE AGED, *Appellant/Cross-Appellee.*

(815 P.2d 72)

Opinion
filed July 12, 1991.

*Brian G. Boos*, of Gehrt & Roberts, Chartered, of Topeka, argued the cause and was on the briefs for appellant/cross-appellee.

*Frank D. Taff*, of Topeka, argued the cause and was on the briefs for appellee/cross-appellant.

*Michael D. Strong*, *Jeffrey A. Chanay*, and *Stewart L. Entz*, of Entz, Anderson & Chanay, of Topeka, were on the brief for *amici curiae* Kansas Association of Homes for the Aging, Inc., and Kansas Chamber of Commerce and Industry.

The opinion of the court was delivered by

ALLEGRUCCI, J.: This is an action challenging the termination of plaintiff Richard Virgil Brown's employment with defendant United Methodist Homes for the Aged (UMH). The plaintiff alleged breach of his contract of employment and retaliatory discharge for filing a workers compensation claim and that defendant provided false information to the Kansas Department of Human Resources, Division of Employment Security (KDHR), so as to deny plaintiff unemployment compensation benefits. The jury rejected the latter two claims but found for plaintiff on the theory of breach of contract and awarded $35,000 in damages. Defendant appeals the verdict and the denial of judgment for defendant as a matter of law on plaintiff's breach of contract claim. The plaintiff cross-appeals, challenging the district court's instruction regarding retaliatory discharge and the court's refusal to instruct the jury about mental anguish as an element of damages.

We first consider UMH's direct appeal. UMH contends that the district court erred in not finding as a matter of law that Brown stated no cause of action for his discharge. Thus, the district court should have granted UMH's motion for summary judgment, should have directed a verdict at the close of both the plaintiff's evidence and all the evidence, and should have granted UMH's motion for judgment notwithstanding the verdict filed after trial was completed. UMH also contends that substantial competent evidence does not support the verdict that an employment contract existed and was breached. The basic question to be decided is whether an implied contract of employment existed between Brown and UMH.

## Standards of Review

The standard of review in an appeal of a summary judgment has been stated by this court on numerous occasions. Summary judgment is proper only when the pleadings, affidavits, and the discovery record show that no genuine issues of material fact exist and that the moving party is entitled to judgment as a matter of law. *Lostutter v. Estate of Larkin*, 235 Kan. 154, 164, 679 P.2d 181 (1984). In reviewing a decision involving summary judgment, an appellate court must read the record in the light most favorable to the party who opposed the motion. *McAlister v. Atlantic Richfield Co.*, 233 Kan. 252, Syl. ¶ 4, 662 P.2d 1203 (1983). Here, this court must give Brown the benefit of all favorable inferences arriving from this record in determining whether the district court erred in denying UMH's motion for summary judgment.

In ruling on a motion for directed verdict, the trial court as well as the appellate court must resolve all facts and inferences reasonably to be drawn from the evidence in favor of the party against whom the ruling is sought. Where reasonable minds could reach different conclusions based upon the evidence, the motion must be denied and the matter submitted to the jury. *Pilcher v. Board of Wyandotte County Commr's*, 14 Kan. App. 2d 206, 208, 787 P.2d 1204 (1990) (quoting *Holley v. Allen Drilling Co.*, 241 Kan. 707, 710, 740 P.2d 1077 [1987]). In deciding a motion for directed verdict, the question before a trial court is not whether there is no evidence to support the party against whom the motion is directed but whether evidence exists upon which the jury could properly find a verdict for that party. In *Sampson v. Hunt*, 233 Kan. 572, 578, 665 P.2d 743 (1983), this court noted that, even where facts are undisputed, it may be possible to draw conflicting inferences from the facts, which would also require the issue to be submitted to the jury. The matter becomes a question of law for the court's determination where no evidence is presented on a particular issue or where the evidence presented is undisputed and is such that the minds of reasonable persons may not draw differing inferences and arrive at opposing conclusions with reason and justice. *Sampson*, 233 Kan. at 578; *Pilcher*, 14 Kan. App. 2d at 209.

The test for determining whether a motion for directed verdict should be granted is the same test applicable to a motion for

judgment notwithstanding the verdict. *Holley*, 241 Kan. at 710; *Turner v. Halliburton Co.*, 240 Kan. 1, 6-7, 722 P.2d 1106 (1986) (citing 1 Gard's Kansas C. Civ. Proc. 2d Annot. § 60-250 [1979]).

Concerning UMH's argument that the verdict was not supported by the evidence, this court has held that when a verdict is challenged for insufficiency of evidence or as being contrary to the evidence, this court does not weigh the evidence or pass on the credibility of the witnesses. "If the evidence, with all reasonable inferences to be drawn therefrom, when considered in the light most favorable to the prevailing party, supports the verdict, it will not be disturbed on appeal." *Wisker v. Hart*, 244 Kan. 36, 37, 766 P.2d 168 (1988).

## Facts

UMH hired Brown on March 15, 1985, as a part-time security guard to work weekend nights between 4:00 p.m. and 12:00 a.m. at its nursing home located at 1135 S.W. College Avenue, Topeka, Kansas. UMH gave Brown its Personnel Policies Manual that addressed disciplinary procedures and employee benefits. Brown signed a receipt for the manual and agreed to abide by its provisions. The manual is in looseleaf form and, as amendments or revisions are made, new pages are furnished to employees in their pay envelopes to be inserted in the manual.

One manual revision, which was effective August 9, 1985, provided:

"Employment with United Methodist Homes is 'at will,' and may be terminated by the Homes without cause. No commitment for employment for any specified duration, including 'lifetime' employment, shall be valid or binding on the Homes unless it is expressly set forth in a written document and signed by the employee and by the Executive Director of the Homes."

A memorandum explaining this "at-will" language provided:

"TO ALL EMPLOYEES:

"You have received the revisions to the Personnel Polices Manual. There are some questions concerning the 'At will' statement on page 3, D and page 31, F, 1.

"This statement has been included at the suggestion of our legal counsel due to a change in the law. It is not a change in policy. The United Methodist Home has always been an 'At will' employer. This simply means that we do not have written contracts with any employees that guarantee a length of employment. For example: the teachers and the school board. This means

that The Methodist Home has the same relationship with you as you have with the Home. In other words, you have the right to quit, just as we have the right to terminate employment. It has always been this way.

"The law has changed in interpretation due to the result of legal action taken by employees against their employer (not the Methodist Home). In these court cases the personnel policy manual was interpreted to be a contract, due to a legal technicality. To cover this legal problem the Legal Advisers ask us to include the 'at will' statement."

The addition of the "at-will" clause did not change the policy of UMH that prohibited dismissal of an employee except "for cause." Orman Thorson, director of environmental services for UMH, explained, "You just don't terminate a person because you want to terminate them. You have got to have some kind of cause." The policies of UMH incorporated the philosophy of the Christian faith, including treating employees fairly.

After about two weeks on the job, Brown was transferred to a full-time security position working Monday through Friday in the same shift of 4:00 p.m. to 12:00 a.m. He continued in this job until February 1986 when he suffered a hernia while lifting trash bags at work, which was part of his duties as a security guard. About a week after his accident, Brown reported this to his supervisor, Orman Thorson. Nearly a year later, on February 2, 1987, Brown for the first time filled out an accident report about the incident, which was done to obtain workers compensation benefits. He thereafter received temporary total disability benefits.

Brown continued at his job as a full-time security guard until the latter part of February 1986, when the pain associated with his hernia became worse. Brown consulted with Dr. Rogelio Sanchez, who recommended that Brown undergo surgical repair of the hernia. Dr. Sanchez instructed him not to lift more than 40 pounds until his hernia was repaired. Thorson and Peter Bonnell, assistant director of plant operations, weighed trash bags and found none weighing over 33 pounds.

Because of the pain Brown was experiencing, Marcella Weibel, UMH's director of housekeeping and Brown's daytime immediate supervisor, consulted with Thorson and granted Brown a leave of absence without pay for 90 days commencing January 20 and ending April 20, 1987. Brown testified that he did not request a leave of absence or understand why he was being placed on

leave. The leave of absence was written by Weibel and signed by Brown, stating:

> "Jan. 20, 1987
>
> Richard Brown has requested leave of absence because of pain and he will have surgery.
>
> He will be on leave of absence without pay for ninety days beginning Jan. 20, 1987 to April 20, 1987.
>
> By Marcella Weibel
> Dir. of Housekeeping
> I am writing this at Richard's request.
>
> Richard Brown"

Concerning approved leave, UMH's manual provided, in part:

> "6. Due to the expense of obtaining temporary replacements, and/or the hardship on the facility caused by leaving the position open, the position may be filled.
>
> "7. When an employee returns from an approved leave of absence, that employee will be reinstated to first available, same, or similar position."

The leave of absence document was backdated by Harriet White, personnel director of UMH, to January 10, 1987, to accommodate UMH's requirement that a leave of absence must be requested by an employee in writing at least 10 days prior to its being granted. This resulted in extending Brown's leave of absence through April 30, 1987, although apparently he was never informed of this action. Meanwhile, UMH needed a full-time security guard to work Brown's shift; Willie Walker, UMH's then part-time weekend security guard, was transferred to fill Brown's full-time position on January 29, 1987.

On March 10, 1987, Brown underwent surgery for repair of his hernia. Brown returned to UMH late in the afternoon on Thursday, April 30, 1987, and spoke with Thorson, who advised him that Willie Walker had been hired to fill Brown's full-time security duties. Thorson offered Brown a part-time weekend security position working 12:00 a.m. to 8:00 a.m., starting Saturday, May 2, 1987, until a full-time position opened up. The parties dispute whether Brown understood that the part-time position was the only available position at that time. It is also disputed whether Brown agreed to take the part-time weekend security job, but it is uncontroverted that Thorson scheduled Brown to work Saturday and Sunday, May 2 and 3, 1987, from 12:00 a.m. to 8:00 a.m.

On Friday, May 1, 1987, Thorson told Weibel that Brown would be reporting to work that weekend and that UMH need not be concerned about having to fill the position. Apparently, on the same day, according to data entry records of KDHR, Brown filed for unemployment compensation benefits, indicating that he was on "leave of absence."

Brown did not report for work at midnight on either Saturday, May 2, or Sunday, May 3, 1987. This required other security guards to work overtime. Brown testified that he had been out of town that weekend and that, upon his return Sunday evening, his wife checked the telephone answering machine and advised Brown that he was to call someone at UMH. Brown testified that he responded, "I kept paying no attention because I ain't going to be bothered with nobody, you know, didn't realize what it was or anything, didn't know what it was."

The following day, on May 4, 1987, Brown was terminated under the terms of UMH's manual that provides that if an employee fails to give notice of an unscheduled absence for two scheduled work days, it is considered grounds for termination.

On May 12, 1987, Automatic Data Processing (UMH's agent for handling unemployment compensation claims) field representative L.N. Collier submitted the following response to KDHR's inquiry concerning the circumstances of Brown's separation from UMH's employment:

"The claimant was discharged because on 5-2-87 and 5-3-87 he was absent from work and failed to call the employer to report his absence. As a result the employer was without the services of a security guard for a period on 5-2-87 and was required to call in substitute guards and pay them at a time-and-one-half rate for the shifts the claimant missed. The claimant had been on medical leave of absence since 1-19-87 and had agreed to return to work beginning 5-2-87. He was aware that employer policy requires absences to be reported on a daily basis and was aware that his unreported absences exposed the elderly residents of the employer's geriatric facility to danger from intruders. Determinations requested regarding his separation from work and regarding his availability for full-time work."

On May 19, 1987, KDHR's claims examiner issued three determinations concerning Brown's claim. The examiner found the claimant was disqualified for benefits until he became re-employed and had had earnings from insured work of $309. The disqualification began on May 3, 1987. The examiner found that

claimant was discharged due to absences. "The absences were not excused because the claimant failed to properly notify the employer of the absence. Misconduct is a violation of a duty or obligation reasonably owed the employer. The claimant was discharged for misconduct connected with the work." Neither Brown nor UMH appealed KDHR's determinations.

Between May 1, 1987, and the date of trial, defendant UMH had several full-time, entry-level positions became vacant that were not offered to Brown. Brown was not notified of these full-time openings.

## Direct Appeal

The basic argument being made by UMH is that Kansas has adopted the employment-at-will doctrine; therefore, Brown could be discharged without cause, and no implied contract existed merely because guidelines were distributed by the employer.

UMH directs this court to *Johnson v. National Beef Packing Co.*, 220 Kan. 52, 551 P.2d 779 (1976). The plaintiff in *Johnson* argued that a company policy manual distributed by the employer to employees during Johnson's employment constituted an express contract or served as a basis for establishing a contract of employment by implication. Johnson argued that the statement in the manual that an employee shall not be dismissed without just cause was enforceable against the employer. This court reviewed the manual and found nothing expressly providing for a fixed term of employment and no language from which a contract to that effect could be inferred. 220 Kan. at 54. The manual was published long after Johnson began his employment with the employer and, therefore, was only a unilateral expression of company policy and procedures. This court concluded that the terms of the manual were not bargained for by the parties and any benefits conferred by it were mere gratuities. No meeting of the minds occurred; instead, the manual was merely defendant's unilateral act of publishing company policy. 220 Kan. at 55.

UMH argues that application of *Johnson* to the present case establishes that the district court erred in not finding as a matter of law that Brown stated no cause of action in arguing that an implied contract had been created through the existence of the manual he received from UMH. UMH points out that, although

Brown received a copy of the manual at the time of his employment and agreed to abide by its terms, the record is devoid of evidence sufficient to establish the necessary elements of an implied contract and, thus, Brown remained an employee at will.

Although the decision in *Johnson* set forth a strict adherence to the employment-at-will doctrine, more recent Kansas appellate courts have recognized the development of various theories that have eroded this doctrine. See *Morriss v. Coleman Co.*, 241 Kan. 501, 511, 738 P.2d 841 (1987). The Court of Appeals, in *Murphy v. City of Topeka*, 6 Kan. App. 2d 488, 630 P.2d 186 (1981), recognized an action in tort for wrongful discharge due to the filing of a workers compensation claim as authorized by statute after sustaining injury on the job. The Court of Appeals analyzed the public policy underlying the Workers Compensation Act and held that the discharge of the employee in retaliation for filing a workers compensation claim is actionable at law and can support an award of both actual and punitive damages. 6 Kan. App. 2d at 495-96. Recently, in *Morriss*, this court noted that *Murphy* is important because "it opened the way to judicial recognition of a variety of public policy considerations which could support actions for tortious retaliatory discharges." 241 Kan. at 511.

Brown cites *Sweet v. Stormont Vail Regional Medical Center*, 231 Kan. 604, 647 P.2d 1274 (1982), in support of his argument that the district court here correctly let this case go to the jury. When Sweet terminated her employment with Stormont-Vail without prior notice, she was paid for her work to the date of termination but not for vacation time because she had not complied with notice provisions in the employee handbook. The court pointed out that none of the parties seriously questioned the applicability of the employee handbook to Sweet's employment. 231 Kan. at 605. The court concluded that, when an employee is made aware of company policy that is a part of the terms of the employment contract, the employee is bound by those terms. Because Sweet acknowledged receipt of the handbook outlining the conditions of her employment contract and her rights thereunder, the court concluded that the requirement of notice of intent to terminate was reasonable because it was consistent with the hospital's need to be adequately staffed for the health and safety of its patients. 231 Kan. at 611.

Brown argues that, along this line, defendant UMH distributed the manuals to provide employees notice of the written leave of absence policy and, in that way, took positive steps to bind itself and its employees to this policy by requiring compliance with the terms set forth in the Personnel Policies Manual.

Both parties discuss the Court of Appeals decision in *Allegri v. Providence-St. Margaret Health Center*, 9 Kan. App. 2d 659, 684 P.2d 1031 (1984). The plaintiff in *Allegri* alleged that he had an implied contract with the employer under terms defined by the parties' course of dealing and the employee handbook's discipline policy that led plaintiff to believe he could be terminated only "for cause." Plaintiff did not rely exclusively upon the terms of the handbook; he also emphasized communications and discussions with his supervisors in arguing the existence of an implied contract.

In deciding whether an implied contract existed in *Allegri*, the Court of Appeals recognized that Kansas traditionally followed the employment-at-will doctrine as set forth in *Johnson*, but the determination of whether an implied contract of employment existed required a factual inquiry. 9 Kan. App. 2d at 663 (citing *Johnson*, 220 Kan. at 54-55, quoting 53 Am. Jur. 2d, Master and Servant § 27, p. 103). In *Allegri*, the court recognized that intent of the parties is normally a question of fact for the jury that is shown by acts, circumstances, and inferences reasonably deducible therefrom. 9 Kan. App. 2d at 663.

In *Allegri*, the court concluded that the trial court erred in considering only the employee handbook and a conversation between plaintiff and one of his supervisors in granting summary judgment. Testimony in the record raised a material question about whether the conduct of the parties evidenced an implied employment agreement. The court recognized that such an agreement cannot be established solely by the employee's subjective understanding or expectation about his employment, but noted:

"[A] mutual intent to employ plaintiff as long as he did his job satisfactorily could be based upon such factors as the longevity of plaintiff's employment with defendant and defendant's predecessors, the nature of plaintiff's employment, plaintiff's rejoining the hospital at the hospital's request after having left to pursue his own private practice, plaintiff's curtailment of that

private practice after returning to the hospital, and the excellent performance evaluations plaintiff received from defendant." 9 Kan. App. 2d at 664.

Therefore, although the court expressed no opinion about the merits of plaintiff's claim that an implied contract existed, the court found sufficient evidence to merit submission of the case to the jury. 9 Kan. App. 2d at 664. In *Morriss*, this court noted that *Allegri* is important "because it established clearly the rule that intent of the contracting parties is normally a question of fact for the jury and that the determination of whether there is an implied contract in employment requires a factual inquiry." 241 Kan. at 512.

This court addressed the employment-at-will doctrine at length in *Morriss*, 241 Kan. 501. The plaintiffs were two former employees of Coleman Company, Inc., of Wichita, who alleged that Coleman had breached an implied contract of employment by discharging them without good cause and by terminating their employment in bad faith, in violation of an implied covenant of good faith and fair dealing. The plaintiffs were an executive secretary and a production supervisor. The secretary had accompanied the production supervisor on a trip to retrieve a car for a supervisor of the company. The secretary paid her own expenses and did not inform the company of her intent to accompany the other plaintiff. The supervisor terminated the two plaintiffs after they delivered his car to Wichita. 241 Kan. at 501-07.

In reviewing the plaintiffs' claims, the *Morriss* court reviewed in detail the employment-at-will doctrine. Under the American common law, an employer may discharge an at-will employee "for good cause, for no cause, or even for a wrong cause, without incurring liability to the employee for wrongful discharge." 241 Kan. at 508. The employment-at-will doctrine is not strictly adhered to when the employer's conduct undermines an important public policy. Both federal and state legislation have restricted the employer's ability to terminate a worker arbitrarily and, although no court has entirely abolished the employment-at-will doctrine, recent cases indicate a trend to avoid the injustice of the rule. Along this line, some state courts have recognized causes of action based upon the theories of wrongful discharge, violation of public policy, and breach of contract. 241 Kan. at 509.

The court in *Morriss* recognized two exceptions to the employment-at-will doctrine commonly used by the courts. First, under an implied contract theory, the employment contract is interpreted more broadly. It recognizes an implied obligation on the employer to not terminate an employee arbitrarily where a policy or program of the employer, either express or implied, restricts the employer's right of termination at will. Thus, employee manual guidelines that set out the grounds and procedures for discharge are viewed as part of the employment contract and bar the employer from violating its own policies in discharging an employee. 241 Kan. at 509.

A second exception has been recognized in suits of a tort nature for retaliatory discharge based on the theory that dismissal of employees for reasons violative of a particular public policy are actionable. Conduct of an employer violative of public policy and giving rise to a cause of action has been recognized when an employee is discharged in retaliation for opposing an illegal or unethical activity of the employer, in retaliation for filing workers compensation claims, in retaliation for exercising rights under labor-management relations statutes, as a penalty for refusing to take a polygraph exam, as a penalty for taking time to serve on jury duty, and for various other violations of public policy interests. 241 Kan. at 509.

In considering the case before it, this court in *Morriss* noted that plaintiffs argued that the trial court erred in granting summary judgment because a genuine issue of fact existed about whether their employment was terminated in violation of an implied contract that an employee would not be terminated except for good cause. Coleman relied upon a paragraph in the supervisor's manual to the effect that nothing in the manual should be construed as an employment contract or guarantee of employment. This court affirmed on petition for review the Court of Appeals' reversal of the trial court's granting of summary judgment; in its unpublished opinion the Court of Appeals had relied upon the following rule stated in Syl. ¶ 5 of *Allegri*:

" 'Where it is alleged that an employment contract is one to be based upon the theory of 'implied in fact,' the understanding and intent of the parties is to be ascertained from several factors which include written or oral negotiations, the conduct of the parties from the commencement of the

employment relationship, the usages of the business, the situation and objective of the parties giving rise to the relationship, the nature of the employment, and any other circumstances surrounding the employment relationship which would tend to explain or make clear the intention of the parties at the time said employment commenced.' " 241 Kan. at 513 (quoting *Allegri,* 9 Kan. App. 2d 659, Syl. ¶ 5).

This court in *Morriss* concluded that the disclaimer in the manual did not determine the issue as a matter of law, pointing out that the disclaimer was neither brought to the personal attention of the employees nor intended by Coleman to create an unqualified employment-at-will relationship, especially in view of other provisions in the manual and statements made by Coleman supervisors to employees. The court emphasized that no trial had occurred in the case. It held that the evidence presented in the record at the time summary judgment was granted was insufficient to require summary judgment in favor of the defendant as a matter of a law. The court stated: "The ultimate decision of whether there was an implied contract not to terminate the plaintiffs without just cause must be determined from all the evidence presented by the parties on that issue." 241 Kan. at 514.

In support of its argument that the district court erred in allowing this case to be submitted to a jury, UMH relies extensively upon *Plummer v. Humana of Kansas, Inc.*, 715 F. Supp. 302 (D. Kan. 1988). Plummer was given an employment handbook when he was hired by Humana and signed a statement acknowledging receipt of the handbook and promising to abide by its contents. The handbook provided that employment with Humana was not of a specific duration and that employees could be discharged for cause or at the convenience of the hospital. When Plummer was terminated, he sued, alleging that the handbook created an implied employment contract which was breached by his termination.

In *Plummer,* Judge Saffels distinguished *Morriss* because Plummer acknowledged receipt of the handbook and had agreed in writing to abide by its terms. No evidence indicated that the management suggested to Plummer that dismissal would be only for cause or that Humana intended to create anything other than an unqualified employment-at-will relationship. Thus, the court found no issue of intent in question, and therefore summary

judgment was appropriate because no implied employment contract existed. 715 F. Supp. at 304.

Both parties cite to *Pilcher v. Board of Wyandotte County Comm'rs,* 14 Kan. App. 2d 206, 787 P.2d 1204 (1990), in which the Court of Appeals affirmed a directed verdict on the claim of breach of implied contract but reversed on the instructions concerning plaintiff's claim for retaliatory discharge for filing a workers compensation claim. The court concluded that the evidence offered by plaintiff was simply not sufficient to carry the issue of implied contract to a jury. The evidence plaintiff offered involved her own testimony and that of a former supervisor concerning their belief that employees would receive three warnings before being fired. The court emphasized that plaintiff did not support this theory with any written documentation or policy and could not state where or from whom she had received this information. Instead, she simply insisted that "everyone said it had always been this way." 14 Kan. App. 2d at 210. Based upon this evidence, the Court of Appeals affirmed the trial court's directed verdict on the issue of implied contract. 14 Kan. App. 2d at 210.

Brown lists five ways in which he distinguishes his case from *Pilcher.* First, he argues that UMH had a written personnel policy especially formulated upon the issue of termination that did not exist in *Pilcher.* Second, Brown presented a written statement by Weibel, director of housekeeping and Brown's immediate supervisor, indicating UMH's administrator had written a note that Brown had received a copy of the leave of absence policy. Third, Weibel admitted at trial that UMH had made a mistake in its treatment of Brown. Fourth, Weibel stated the philosophy of UMH was to treat employees fairly and recognized that Brown was eligible for the extended illness policy used by UMH, but that he was erroneously placed on a leave of absence without pay. Finally, Weibel acknowledged this error and apologized from the witness stand about the failure to use UMH's extended illness policy instead of the leave of absence without pay.

*Plummer* is distinguishable on its facts from the present case. In that case, Plummer relied solely on the handbook, which he acknowledged receiving and reading, including the disclaimer provision, when he was first hired. Here, the handbook was amended as to the disclaimer after Brown started working for

UMH. The handbook in *Plummer* contained no statements about termination for cause. As Judge Saffels noted, "there is no evidence that management indicated dismissals would only be 'for cause.'" 715 F. Supp. at 304. Here, although the manual did make clear that discharge could occur without cause, the stated policy of UMH was to treat all employees fairly in accordance with Christian principles and not to discharge an employee except "for cause." In *Plummer*, the handbook stated that discharging an employee could occur "at the convenience of the hospital."

The district court here refused to grant summary judgment because factual issues remained that needed to be determined by the trier of fact. The court's memorandum decision discusses at length the claim regarding wrongful discharge based upon the filing of a workers compensation claim. The jury rejected this as a basis for recovery by Brown. A review of the motion for summary judgment filed by UMH, the response filed by Brown, and the reply by UMH establishes that questions of fact did exist about the role of the Personnel Policies Manual in giving rise to an express or implied contract of employment. The record must be read in the light most favorable to Brown, who opposed the motion. If this is done, the intent of the parties through the distribution of the Personnel Policies Manual presented a question of fact that needed to be submitted to a jury. Addition of the employment-at-will language after Brown's employment presented questions about its applicability to Brown. The district court did not err in denying summary judgment.

We next consider the district court's denial of defendant's motions for a directed verdict and judgment notwithstanding the verdict. At trial, the Personnel Policies Manual was presented as well as the amendment that occurred specifying that employment with UMH is "at will" and that employees may be terminated by UMH without cause. The provision specifically stated that no commitment was made for a specific term of employment. This amendment was accompanied by the memorandum that specifically explained that UMH was an at-will employer and did not guarantee a length of employment to its employees.

The written personnel policy alone is not sufficient to establish an implied contract of employment of a term of specific duration. However, Brown argues that the manual, in addition to testimony

that occurred at trial, established that an implied contract could be found by the jury. The testimony he refers to is that of Weibel: that the philosophy of UMH was "to be fair to the employees," that a mistake had been made in calculating Brown's leave of absence, and that Brown had been mistakenly placed on leave of absence without pay instead of being placed on extended illness leave with pay until the time he had accumulated under that benefit had been used.

The evidence offered by Brown is not extensive. The Personnel Policies Manual contains specific provisions for terminating an employee, including a list of policy violations that are grounds for termination. Yet this manual contains two statements stressing that employment with UMH is "at will." Brown presents no evidence of additional conversations or statements made to him indicating that the terms of the Personnel Policies Manual were meant to be an implied contract of employment requiring his continued employment unless dismissed for cause. Brown instead relies upon the trial testimony of UMH supervisory employees indicating their intent to treat employees fairly and to follow the rules.

Although the facts and inferences reasonably to be drawn from the evidence in favor of Brown are not strong, it is possible that reasonable minds could reach different conclusions based upon the evidence about whether a motion for directed verdict should be granted or denied. In such a case, the evidence must be submitted to the jury. Only when no evidence is presented on an issue, or when the evidence presented is undisputed and is such that the minds of reasonable persons cannot draw differing inferences and arrive at opposing conclusions with reason and justice, does the matter become a question of law for the court's determination. Therefore, the district court did not err in denying the motion for directed verdict concerning the issue of an implied contract of employment or in denying the motion for judgment notwithstanding the verdict.

Finally, UMH argues that the verdict was not supported by substantial evidence or was contrary to the evidence. The evidence must be considered in the light most favorable to the prevailing party, Brown. The manual asserts that the employment was at the will of the employer but provides for termination upon

the happening of specific events. The philosophy of the employer suggests a desire to treat employees fairly and under the philosophy of Christian living that may go beyond the normal employment relationship. Since we find that these circumstances are adequate to withstand a motion for directed verdict and a motion for judgment notwithstanding the verdict, it follows that such evidence is also sufficient to support the jury's verdict.

After arguing at length that the district court erred in submitting the breach of contract issue to the jury, UMH asserts that even if an implied contract existed, no evidence was presented to establish that UMH breached the contract by not returning Brown to the "first available, same, or similar position" upon his return from an approved 90-day leave of absence. In support of this argument, UMH indicates that it is indisputable that, during the three months Brown was absent, UMH had to find someone to fill his position to secure the safety of its residents. The manual expressly provides that, because of the expense of obtaining temporary replacements or the hardship on the facility caused by leaving a position open, a position may be filled during a leave of absence. UMH further argues that Brown was offered the only security position available at the time, although part time, which complied with the provisions of the policy manual.

Brown presented evidence that other full-time positions became available after his return from his leave of absence and prior to trial, but he was never notified of any of these positions. Although some question existed about his ability to fulfill some of the positions that became available, such as floor finisher and housekeeper, the district court did not err in submitting to the jury the question of whether UMH complied with the provisions of its manual in making these positions available to Brown upon his return from leave.

UMH also argues that Brown was discharged for cause because uncontroverted evidence established that he was scheduled to work May 2 and 3, 1987. The manual provides that two unscheduled absences from work are grounds for termination, and, UMH argues, since Brown did not report for work as scheduled and expected, UMH was justified in discharging him for cause.

Brown's evidence concerning the acceptance of employment for the part-time security position contradicts that of UMH. Brown specifically stated that he refused the offer of employment because he could not afford to work for those earnings. Whether an implied contract of employment existed is a classic question of fact that had to be submitted to the jury. Therefore, the district court did not err in submitting the questions concerning the discharge of Brown to the jury for determination.

The defendant next argues that the district court abused its discretion in denying defendant's request to amend the pretrial order to assert the defenses of res judicata and collateral estoppel. On March 26, 1990, the day before trial was to begin, UMH filed a motion for leave to modify the pretrial order to allow UMH to assert the affirmative defenses of res judicata and/or collateral estoppel as a bar to plaintiff's claims. The matter was considered by the court at a hearing the afternoon before trial began. The court ruled the next morning, just prior to the trial, that the motion to modify the pretrial order would be denied. The court ruled first that the motion was untimely, was minimally briefed, and gave no time for plaintiff to respond. The court further ruled that, even if the motion had been timely, plaintiff's claim was not barred by res judicata or collateral estoppel. We first address the district court's ruling that the motion was untimely.

Pursuant to K.S.A. 1990 Supp. 60-216, a trial court may conduct a pretrial conference to simplify the issues, determine the necessity of amending the pleadings, consider the possibility of obtaining admissions of fact and of documents that will avoid unnecessary proof, and review other matters that may aid in the disposition of the action. Following such a conference, the court, in its discretion, or if requested by the parties, shall make an order reciting the action taken at the conference, the amendments allowed to the pleadings, and the agreements made by the parties that concern any of the matters considered and that limit issues for trial to those not disposed of by admissions or agreements. When such an order is entered, it controls the subsequent course of the action "unless modified at the trial to prevent manifest injustice." K.S.A. 1990 Supp. 60-216(a). The provisions of 60-216 give the trial court great discretionary power that is abused only

when no reasonable person would take the view adopted by the trial court. The exercise of judicial discretion requires the judge to have proper regard for what is just and fair under the existing circumstances and requires that he or she not act in an arbitrary fashion or unreasonable manner. *State Farm Fire & Cas. Co. v. Liggett*, 236 Kan. 120, 124-25, 689 P.2d 1187 (1984).

UMH argues that the district court abused its discretion in failing to allow amendment of the pretrial order because it did not comply with legitimate objectives of securing the just, speedy, and inexpensive determination of the action. In support of its argument, UMH points out that, in *Commercial Credit Corporation v. Harris*, 212 Kan. 310, 510 P.2d 1322 (1973), the trial court did not abuse its discretion in allowing a defendant to assert an affirmative defense as late as the morning of trial. This court noted that no error will lie in ruling upon the exercise of the discretion of the trial court unless such discretion is abused. This court pointed out that plaintiff could have requested a continuance if it was unprepared to defend against defendant's allegation of misrepresentation raised in the late defense. If a request for a continuance was denied, then the appellate court would review whether the trial court abused its discretion due to a showing of surprise and lack of time to prepare. 212 Kan. at 312-13.

In response, Brown directs this court to *Hoover Equipment Co. v. Smith*, 198 Kan. 127, 132, 422 P.2d 914 (1967), discussing the trial court's exercise of discretion in allowing an amendment to a pleading. Plaintiff sought to amend its petition to state an additional claim after its motion for summary judgment had been denied and before a pretrial conference was held. Pursuant to K.S.A. 60-215(a) and (d), application to amend a pleading is not permitted as a matter of course after a responsive pleading is served but may be granted by leave of the court. Here, permission to amend was refused. This court noted that the trial court "is given wide latitude and discretion in permitting or refusing amendments of pleadings in the interests of justice. In the absence of a clear abuse of discretion the order of the trial court should be approved." 198 Kan. at 133.

A review of the record here indicates that the district court did not act in an arbitrary fashion or unreasonable manner. The motion for leave to modify the pretrial order was filed the after-

noon before trial was scheduled to begin. UMH asserts that Brown had notice of this potential claim because UMH had previously argued that the effect of KDHR's rulings was adverse to Brown because he had failed to exhaust his administrative remedies for unemployment compensation. Yet UMH admittedly did not present its claim of res judicata or collateral estoppel until just prior to the beginning of trial.

The record indicates that UMH had ample opportunity to include these defenses prior to the afternoon before trial. We find that the district court did not abuse its discretion in refusing to allow inclusion of these defenses at that late date.

The final issue raised by defendant is whether the district court erred in refusing to grant a remittitur. The jury awarded a verdict of $35,000 in damages. In its motion for judgment notwithstanding the verdict or, in the alternative, for a new trial, UMH asked the district court to reduce the jury verdict to be in conformity with applicable Kansas law. UMH argues that the damages awarded here exceed those appropriate for recovery in a breach of employment contract case, where a party is entitled to recover only his actual damages less those he might have reasonably prevented. *Lines v. City of Topeka*, 223 Kan. 772, 577 P.2d 42 (1978). The court noted:

"In a case involving wrongful discharge from employment the proper measure of damages is the amount the salary for the period would have been less the amount plaintiff earned, or which with reasonable diligence he could have earned, had he applied the same ability and devotion in a comparable job." 223 Kan. at 781.

UMH points out that Brown was 60 years old at the time of his discharge and earned $4.38 per hour. A full-time job would involve 40 hours per week; the part-time security guard position involved 16 hours per week. Using the damages calculation set out in *Lines*, UMH argues that Brown's damages should have been calculated by multiplying the hourly rate of $4.38 times 24 hours per week (which is 40 full-time hours less the 16 part-time hours Brown could have worked at UMH) times 52 weeks per year. This results in loss of a yearly income of approximately $5,460. Because Brown retired when he was 62 years old, the amount he could have earned would be multiplied by two years, or approximately $10,920. UMH argues that this, not the $35,000

verdict, is the appropriate amount of damages that Brown should have been awarded. Although a jury's determination of damages is ordinarily held in high esteem, the damages cannot be too conjectural and speculative to form a sound basis for measurement. *Johnson v. Baker*, 11 Kan. App. 2d 274, 276, 719 P.2d 752 (1986). Yet damages do not have to be established with absolute certainty. 11 Kan. App. 2d at 277.

Brown counters that he could have worked until he was 70 years old and would have earned about $10,000 per year. Therefore, he could have earned $100,000 before mandatory retirement, not including retirement benefits that he lost due to his termination. Brown argues that the party injured in a breach of contract case is entitled to compensation for injuries sustained and "is to be placed, so far as it can be done by a money award, in the same position he would have occupied if the contract had been performed." *Steel v. Eagle*, 207 Kan. 146, 151, 483 P.2d 1063 (1971).

Brown argues that the award here was barely adequate. He had earned $4.38 per hour and worked 40 hours a week with frequent overtime, earning about $10,000 per year. He insists in his brief that he would have worked at UMH as long as he could have, presumably until he had to retire at age 70. At trial he testified that he would have stayed at UMH until he was 65.

In *Barnes v. St. Francis Hospital & School of Nursing*, 211 Kan. 315, 321, 507 P.2d 288 (1973), this court stated the rule on remittitur as follows:

"Where a verdict is so excessive and out of proportion to the damages actually sustained as to shock the conscience of the court, and the verdict has been approved and judgment entered thereon, and where no passion or prejudice has been shown other than the size of the verdict itself, this court may, on appropriate occasions, tentatively affirm the judgment on condition that the plaintiff accept a judgment in a somewhat lesser amount, reserving the right to reverse the judgment in case the plaintiff does not accept the smaller sum. [Citation omitted.] In *Slocum v. Kansas Power & Light Co.*, 190 Kan. 747, 749, 378 P.2d 51, one of our later cases on the subject, we said this court would not require the plaintiff to accept a remittitur or else grant a new trial unless, under the facts of the particular case, the judgment was so large that it could not in reason be allowed to stand."

The award of $35,000 in damages does not shock the conscience of the court in this case. Using the figures suggested by UMH, if Brown had retired at age 62 he would have incurred lost wages of approximately $11,000. If he had stayed on until age 65, which he indicated at trial, he would have incurred lost wages of approximately $27,000. If he had continued his employment until mandatory retirement at age 70, he would have lost approximately $55,000 in wages. These figures contain no consideration for inclusion of an amount to cover the loss of retirement benefits, health benefits, and other benefits he was entitled to receive in connection with his job. We find no error in the district court's refusal to grant a remittitur in this action.

## Cross-Appeal

We next consider Brown's cross-appeal. Brown asserts that the district court failed to instruct the jury properly on the issue of retaliatory discharge. The challenged language is contained in the third paragraph of Instruction No. 4. The first paragraph informed the jury that plaintiff's employment was terminable at the will of either party and could be terminated at any time as long as the reason for termination was not unlawful and did not violate the terms of an agreed-upon personnel policy. The second paragraph informed the jury that an employer could lawfully terminate an employee who failed or refused to perform the duties of his employment even if reasons for the refusal were based upon a physical incapacity that arose out of and in the course of employment with the employer, subject to the terms of an agreed-upon personnel policy. The third paragraph of the instruction, to which Brown objected, provides as follows: "You are further instructed that it is unlawful for an employer to terminate an employee if the act of termination by the employer *was motivated or caused solely* by the employer's desire to retaliate against the employee for his intention of pursuing a claim for workmen's compensation benefits." (Emphasis added.)

Although he did not submit a proposed instruction in writing, as part of his objection Brown argued that this last paragraph should read as follows: "You are further instructed that it is unlawful for an employer to terminate an employee if the act of termination by the employer *was primarily motivated* by em-

ployer's desires to retaliate against the employee for his intention of pursuing a claim for workmen's compensation benefits." (Emphasis added.) Brown could give the court no authority to support the objection, which the court overruled. In his cross-appeal, Brown argues that the provisions of PIK Civ. 2d 18.54A (1990 Supp.), concerning wrongful discharge/retaliatory discharge, are more favorable to plaintiff than the instruction given by the district court. The proposed instruction, which plaintiff asserts was published after this case was tried, provides as follows:

"An employee may recover for retaliatory discharge if the facts and circumstances prove that the employee's termination was based on retaliation. Retaliatory discharge may be proved by a showing that the employee was terminated because:

. . . .

2. The employee exercised a statutory right by [pursuing a claim for workers compensation]."

In support of his argument, Brown directs this court to *Smith v. Atlas Off-Shore Boat Service, Inc.*, 653 F.2d 1057 (5th Cir. 1981), which approved the use of an instruction that was very similar to that requested by Brown at the instructions conference. The claim for retaliatory discharge in *Smith* arose from general maritime law. In providing guidance to the district courts within the circuit, the Fifth Circuit noted that, to prevail on the retaliatory discharge claim, the seaman had to affirmatively establish that the employer's decision "was motivated in substantial part by the knowledge that the seaman either intends to file, or has already filed, a personal injury action against the employer." 653 F.2d at 1063-64. Brown does not direct this court to any Kansas cases discussing the claim of retaliatory discharge to support his argument that the district court erred in instructing the jury that the act of termination was motivated or caused solely by the employer's desire to retaliate.

UMH directs this court to the decision in *Pilcher*, 14 Kan. App. 2d 206, arguing that the instructions in any action are to be considered together and read as a whole and, where they fairly instruct the jury on the laws governing the case, error in an isolated instruction may be disregarded as harmless. Therefore, if the instructions are substantially correct, they will be approved

on appeal because the jury could not reasonably have been misled by them. 14 Kan. App. 2d at 214.

UMH argues that the third paragraph of Instruction No. 4 is virtually identical to PIK Civ. 2d 18.54A (1990 Supp.) except for the use of the term "solely" rather than "based on." Both instructions place the burden on plaintiff to establish that the employer discharged the employee in retaliation for filing or intending to file a workers compensation claim. This causal relationship must be established between the exercise of the employee's right and his firing by the employer. The instruction was substantially correct because, regardless of whether the term "solely" was included, the jury was still charged with finding that plaintiff's discharge was caused by his intention to pursue a claim for workers compensation benefits. Based upon the evidence presented, the jury found that no retaliatory discharge had occurred. In addition, UMH argues that the evidence here did not support a finding of retaliatory discharge because, when asked if he was fired for filing a workers compensation claim, Brown answered, "I don't know why I was fired, sir, really."

We find merit in UMH's argument. The cases in Kansas that have discussed retaliatory discharge for the filing of a workers compensation claim do not state that this must be the sole ground for termination. This claim was first recognized in *Murphy v. City of Topeka*, 6 Kan. App. 2d 488. The court found that plaintiff alleged a valid cause of action for retaliatory discharge but refused to allow punitive damages because this was the first time the cause of action was recognized in Kansas. 6 Kan. App. 2d at 497. In discussing the claim, the court gives no suggestion that the sole basis for the termination must be retaliation for the filing of a workers compensation claim.

Brown has the burden to establish that he was discharged for filing a workers compensation claim. Under the facts of this case, Brown was discharged because he either agreed to work the weekend and failed to do so, as alleged by UMH, or for filing a workers compensation claim, as alleged by Brown. Therefore, Brown's burden to establish the latter was the same whether it was "motivated or caused solely," "primarily motivated by," or "based on" the employer's desire to retaliate against him. We agree with UMH that, in either case, the jury was required to

find that Brown's discharge was due to his filing a claim for workers compensation. Although PIK Civ. 2d 18.54A (1990 Supp.) is preferred, the instruction given by the district court was not erroneous based on the facts of this case.

Because of the foregoing decision, we need not consider whether the district court erred in refusing to instruct the jury on mental anguish as an element of damages.

The judgment of the district court is affirmed.

ABBOTT, J., concurring: Based on the record before us, I concur in the result. I disagree with the majority that the jury instruction on retaliatory discharge was not erroneous. The word "solely" unduly restricts the employee's cause of action for retaliatory discharge.

It will be a rare employer who admits the reason an employee is terminated is in retaliation for filing a workers compensation claim. Some other reason will always be expressed and, when a jury is instructed the employee can only recover if the discharge was "solely" because the employee filed a workers compensation claim, the employee simply will not prevail on a retaliatory discharge claim.

I would not reverse in this case, however, because the employee failed to submit a proposed instruction in writing on the subject.