No. 46,256

In the Matter of the Estate of M. B. Countryman, Deceased. MARIE COUNTRYMAN, *Appellant*, v. DOROTHY LUCAS and WILBER COUNTRYMAN, Executors, *Appellees.*

(494 P. 2d 1163)

Opinion filed March 4, 1972.

*John M. Wall*, of Sedan, was on the brief for the appellant.

*Harold G. Forbes* and *Dale L. Pohl*, of Forbes and Pohl of Eureka, were on the brief for the appellees.

The opinion of the court was delivered by

FOTH, C.: This is the second time Marie Countryman, widow of M. B. Countryman, has appealed from an order denying her claims against his estate. The decision of the first appeal is reported as *In re Estate of Countryman*, 203 Kan. 731, 457 P. 2d 53. The parties have stipulated that the record in the prior proceeding should be considered in this proceeding, and we incorporate herein what we said in our prior opinion.

In that opinion we found error in the trial court's judgment as to two of appellant's several claims and remanded the cause for further hearing on the merits of those two claims.

The first was her claim for pasture rent on the home place, of which she was the life tenant under the will, and which was used during part of the summer of 1964 to pasture cattle which had belonged to the decedent. These cattle were part of the residuary estate, in which the executors were to share individually.

After a hearing on remand the trial court filed a memorandum opinion, and as to this point entered the following findings and conclusions:

"1. At the time of his death on March 25, 1964, decedent M. B. Countryman, owned certain cattle listed in the inventory of his estate as follows:

184 cows
6 bulls
45 mixed
13 mixed and yearlings
100 calves on the cows.

"2. All of the cattle were bequeathed by the terms of the will to Wilber E. Countryman and Dorothy Lucas, whom he appointed as executors of his will.

"3. Claimant, Marie Countryman, was devised the Home place consisting of 1,160 acres, until her death or remarriage. She had about 18 head of her own cattle, pastured 'all over.'

"4. The cattle of decedent were pastured on the Home place; on the Horn property which belonged to decedent's grandchildren, subject to a reserved life estate in decedent; and, on the Richolson property, in which decedent and claimant both had an undivided one-half interest. The Horn property consisted of 420 acres and the Richolson property of 280 acres.

"5. Of the above cattle about 86 head were pastured on the Home place at the time of decedent's death, and about that number remained there until June 21, 1964.

"6. The 45 mixed cattle were soon sold, in April 1964, and claimant is not claiming rent for them. They had been kept in the feed lot.

"7. The other cattle remained on the property where they were until after the appointment of the executors. Mrs. Countryman continued to look after all the cattle. She was assisted by Donald Hebb, who was hired by Wilber Countryman and Dorothy Lucas, as individuals, to help look after the cattle.

"8. The Probate Court of Elk County appointed Wilber Countryman and Dorothy Lucas executors on May 11, 1964. At about that time there was a conversation in which claimant, the executors, and attorney Noel Mullendore took part concerning payment of rents. Mr. Mullendore said the executors might owe Mrs. Countryman rent, but he was not sure. Wilber Countryman and Dorothy did not at any time agree to pay claimant rent for the Home place.

"9. The pasture season in Elk County lasts from about mid-April to mid-October.

"10. The evidence is not very clear as to the times of events concerning the selection and purchase of cattle by Mrs. Countryman. As nearly as I can determine, at about the time of the appointment of the executors or prior thereto Mrs. Countryman had expressed a desire to purchase some of the cattle belonging to the estate, and the respondents agreed that she might do so. The cattle were under quarantine because of Bang's disease and could not be sold on the open market. On about June 21, 1964, claimant, respondents and certain other individuals met together at the Home place. All the cattle belonging to the estate were brought together there and Mrs.

Countryman indicated the ones she wished to buy. She selected 108 cows, with which there were 33 calves, and 3 bulls. These were 'cut out' or separated from the rest of the herd and those not selected were taken back to other pastures. The 108 cows with calves and the 3 bulls remained on the Home place thereafter. The parties did not agree as to the price to be paid by claimant at that time, and payment was not made then but the parties had agreed on the method by which the price would be established. In the latter part of July, 1964 Mr. Mullendore wrote a letter to Mrs. Countryman asking whether she desired to purchase the cattle, but in the meantime, Mr. Mullendore had not talked to respondents about it. Mrs. Countryman had the cattle appraised on about October 9, 1964, and soon afterward the price to be paid by claimant was determined. She paid for the 108 cows with 33 calves and 3 bulls in the early part of November, 1964.

"11. Wilber Countryman testified that additional calves were born to the 108 calves after June 21, 1964, but that he did not know what happened to them. Mrs. Marie Countryman testified she did not get them. There is not sufficient evidence to solve the mystery of the missing calves.

"12. The executors paid the taxes on the Home place for the year of 1964 in the amount of $1,090.00.

"13. The fair and reasonable market, rental value of the Home place for pasture purposes for the pasture season of 1964 was $30 per head. On a per acre basis, the fair rental value was $4 per acre for the year.

"14. The exact amount of pasture land used by respondents is not clearly shown, but it would appear that about 910 acres of the 1,160 acres in the Home place were used.

"15. The executors took possession of only so much of the Home place as was necessary for the management of the estate and did not unnecessarily deprive claimant of the right to possess so much of the real estate as they did not need.

"16. The sale of the cattle by respondents to claimant was completed on June 21, 1964. It had been agreed prior to that time that the price would be established by an appraisal by a commission man, Marion Ray. The evidence is conflicting, but it seems probable that, as testified by Wilber Countryman at the first trial, Mr. Ray was there twice: on June 21, 1964 and on October 9, 1964.

"17. The executors first took possession of 910 acres of the Home place on May 11, 1964, and retained possession thereof until June 21, 1964. From and after June 21, 1964, Marie Countryman had complete possession of the Home place.

"CONCLUSIONS OF LAW
AS TO CLAIM FOR PASTURE RENT

"1. The burden of proof was upon the claimant to establish her right to recover rent and, if established, the burden was on her to show the basis for and the amount of such rent.

"2. Other than for statutory exceptions, to constitute a claim or demand against the estate of a decedent on obligation must have accrued during the lifetime of the decedent.

"3. An *estate* is not liable for contracts, express or implied, created by an

executor or administrator in connection with the management of the estate. The executor or administrator may be personally liable.

"4. An *estate* is not liable for the trespasses or other torts of an executor or administrator committed with managing the assets of the estate.

"5. 'Rent' is the compensation or return of value given at stated times for the possession of lands and tenements corporeal. (*In re Perlmutter's Will*, 282 N. Y. S. 282.) Without possession there is no obligation to pay rent. (*Grommes v. St. Paul Trust Co.*, 147 Ill. 634, 35 N. E. 820) '/F/ or the tenant can make no return for a thing he has not.' (*Hoeveler v. Fleming*, 91 Pa. 322.)

"6. An executor has a right to the possession of his decedent's real estate until the estate is settled, but in the absence of testamentary direction to the contrary, his right of possession is permissive only and the possessory rights of a devisee are not excluded until the executor has asserted his right to possession. (Quoted from the opinion of the Supreme Court of Kansas in this case.)

"7. In the absence of a stipulation to the contrary, one does not have to pay rent for possession to which he has a right by statute.

"8. In this case, the executors assert the right to possession of 910 acres of the Home place from the time of their appointment on May 11, 1964, until June 21, 1964, and at the latter date their possession ceased. The action of the executors in continuing to maintain cattle of the estate on the land of the decedent, as was done in this case, constituted 'asserting their right to possession.'

"9. The executors did not bind the estate to pay rent.

"10. The executors could not bind the estate to pay rent.

"11. There was no contract for rent between claimant and respondents.

"12. There is no evidence of trespass by executors upon the Home place.

"13. If there were trespasses by the executors upon the Home place, the estate would not be liable for such.

"14. The claim for pasture rents by Marie Countryman should be denied. Costs should be assessed against the claimant.

"15. If claimant were entitled to recover rent against the estate, the reasonable rental for the 910 acres for the 41 days from May 11, 1964 until June 21, 1964, would be $588.24. However, if claimant were entitled to collect rent upon the Home place from the estate, then she would be liable for the taxes. The executors paid those taxes in the amount $1,090, and would be entitled to have that payment set off against Mrs. Countryman's claim. Therefore, there would be nothing due to Mrs. Countryman from the estate."

The critical finding, as we see it, is that the executors took possession of the pasture in question, and did so in their representative capacity. Their statutory right to assert such possession was recognized and discussed in our prior opinion in this case, and in cases cited therein, particularly *Riling, Executor v. Cain*, 199 Kan. 259, 428 P. 2d 789. In *Riling* we distinguished an executor's permissive *right* to take possession of his decedent's *real estate* from his *duty* to take possession of the *personalty*.

In addition to the "compelling reasons" for taking possession

referred to in *Riling*, supra, 199 Kan. at 263, we believe the statute gives an executor discretion to assert the right during the period of administration—at the very least where it is reasonably related to the custody, management and preservation of the assets of the estate.

The duty here was to marshal the assets of the estate and to take possession, along with other personalty, of the cattle here in question. These particular cattle, it appears, were under quarantine, so the executors were required to keep them for the time being. The question was, where? They chose to use a portion of the home place, which they had a right to use under the statute. We believe this was a reasonable choice under the circumstances, and we concur in the trial court's conclusion that their making it did not subject the estate to liability for rent.

What personal liability the executors might have incurred had their choice been dictated by whim or malice, or had they extended their occupancy beyond the territorial and temporal boundaries reasonably required to carry out their duties, is not before us.

The second issue heard by the trial court on remand was appellant's claim to a tract of land known as the Richolson property. This claim was based on an alleged oral contract with the decedent whereby, if she would join in the execution of a deed to decedent's grandchildren of a tract known as the Horn place, she was to have decedent's undivided one-half interest in the Richolson property. This issue was remanded because the trial court had decided it on appellant's deposition only, rejecting her offer of live testimony to amplify or explain what we regarded as meager details of the alleged contract.

Such testimony was received, and led to the following findings:

"1. Claimant and decedent were married on September 4, 1943. At that time decedent owned a considerable amount of property but claimant owned very little—probably about $100 in addition to her personal effects.

"2. By the terms of their antenuptial agreement, executed the date of their marriage, claimant and decedent agreed that real estate acquired during their marriage as a result of their joint efforts should be jointly owned and upon the death of M. B. Countryman claimant would have an undivided one-half interest therein. The agreement also provided that both parties would have the right to own, control and dispose of their separate property the same as if the marriage relationship did not exist.

"3. After the marriage, claimant worked hard upon the property of decedent and upon the property jointly acquired. She worked much the same as an able-bodied man would in the handling and caring for cattle.

"4. The parties carried out the terms of their agreement as property or income was acquired. That is, they divided up the income at the close of each year; and, they took the title to real estate according to the source of the funds used to pay for it, sometimes in the name of claimant, sometimes in the name of decedent, and sometimes in the names of both. Documentary evidence indicates that it was the practice of decedent to give claimant more than her one-half share of the income each year. This factual conclusion is orally disputed by claimant, but she did not come forward with a reasonable explanation that would indicate otherwise, although it appeared that records were available to show, in most instances, what the transactions between the parties were.

"5. On January 26, 1946, claimant and decedent acquired the real property referred to as the Richolson property. Each paid one-half the purchase price from his or her separate bank account and they took the title in both their names as tenants in common.

"6. On May 1, 1948, decedent completed the purchase of the property known as the Horn place. The deed was dated October 29, 1947. Decedent paid for the Horn place from his own separate funds and claimant did not pay any part of the purchase price. Title was taken in the name of decedent alone.

"7. On July 31, 1948, decedent deeded the Horn place to his grandchildren. Claimant joined in the deed. The decedent reserved a life estate solely in himself, and did not include claimant as a life tenant.

"8. The deed was executed at the office of attorney Noel Mullendore.

"9. The terms of the antenuptial agreement provided that if either party desired to transfer or convey any property owned separately by him or her then the other party was obligated to join in the conveyance.

"10. Mrs. Countryman claims that she was promised decedent's half interest in the Richolson property for joining in the deed. I do not find in the evidence clear, cogent and convincing proof that a meeting of the minds took place in this regard. The evidence does not show that there was consideration for such an agreement. As against the oral self-serving testimony of claimant, supported by that of her sister, the following facts appear, among others, in the evidence which seem to refute such a contention:

"a. Claimant failed to mention such an agreement or procure a deed to carry it out on July 31, 1948.

"b. Claimant failed to mention such an agreement at the time of the execution of the codicil on May 14, 1963.

"c. Claimant did not mention such an agreement to any other person or do anything consistent with such an agreement at any time during the lifetime of decedent.

"d. Decedent, in the presence of the claimant, during his lifetime, refuted the possibility of such an agreement in the office of attorney Noel Mullendore.

"e. As previously mentioned, the life estate was reserved solely in the name of decedent.

"11. If an agreement did exist whereby decedent promised claimant his one-half of the Richolson property, claimant fully knew her rights on July 31, 1948, and could have enforced the agreement at that time or, at least, during the lifetime of the decedent within the period of time limited by statute thereafter."

As matters of law the court concluded, first, that appellant had failed in her proof of an agreement. In addition it concluded that there was no consideration for such agreement if any was made, that there was no resulting or implied trust, and that she was barred both by the statute of limitations and by laches.

In our view the first conclusion, based on finding number 10, was wholly sufficient to support the judgment. The court correctly applied a "clear, cogent and convincing" standard to appellant's proof of the alleged oral contract as noted in our previous opinion in this case, 203 Kan. at 738-39, and cases cited. See also *In re Estate of Billinger*, 208 Kan. 327, 491 P. 2d 924. When appellant's evidence of the agreement fell short of that standard, for reasons set forth in its findings, the trial court denied her claim.

This is a negative finding of fact in its purest form, and could be disturbed on appeal only if it were the result of "arbitrary and capricious disregard of undisputed evidence or some extrinsic consideration such as bias, passion or prejudice." *American Housing & Investment Co. v. Stanley Furniture Co.*, 202 Kan. 344, 449 P. 2d 561, Syl. ¶ 1. See also *Schroeder v. Richardson*, 196 Kan. 363, 411 P. 2d 670, Syl. ¶ 6, and cases cited in our previous opinion herein, 203 Kan. at 739. Clearly none of these elements were present here, where the trial court gave sound reasons for its finding that appellant had failed to sustain her burden of proof.

The judgment is affirmed.

APPROVED BY THE COURT.