NOT DESIGNATED FOR PUBLICATION

No. 123,900

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

ROBERT W. WOODARD, CLAUDE L. WOODARD JR., and GLORIA ANN BOYETT,
*Plaintiffs*,

v.

RODGER E. HENDRIX,
*Appellee*,

and

BARBARA BARTELL and JOHN BARTELL,
*Appellants*.

MEMORANDUM OPINION

Appeal from Osborne District Court; PRESTON PRATT, judge. Opinion filed June 24, 2022. Affirmed.

*Richard E. Dietz*, of Dietz & Hardman Law Office, of Osborne, for appellants.

*Chasen R. Katz*, of Thompson, Arthur, Davidson & Katz, of Russell, for appellee.

Before GREEN, P.J., ATCHESON and HURST, JJ.

HURST, J.: This case stems from an unfortunate family dispute over a one-fourth interest in a large piece of land in Osborne County owned by Wendell E. Woodard at the time of his death. The disputing family members are cousins, and the nephew, niece, and nephew-in-law of Wendell E. Woodard. Woodard's nephew, Rodger Hendrix, claims that

Woodard left an undivided one-fourth interest in the land to him and his cousin, Barbara Bartell. However, Barbara claims Woodard left that same piece of land to herself and her spouse. After a trial, the district court ruled in favor of Rodger. Finding no error in the district court's actions, this court affirms.

FACTUAL AND PROCEDURAL BACKGROUND

Wendell E. Woodard died on October 7, 2018, at the enviable age of 102, after working as a farmer his entire life. Wendell never had children of his own and lived the vast majority of his life on his own. Although Wendell had no children, his two brothers and four sisters had several children between them, Wendell's nieces and nephews, who were the natural objects of the bounty of Wendell's estate. One nephew, Rodger Hendrix, was particularly close with Wendell, visiting him often, helping with his farm when he could, and eventually taking care of his house while he was in the nursing home. Rodger and his mother, Phyllis, were listed as Wendell's attorneys-in-fact under a durable power of attorney drafted in 2004.

Many years before his death, Wendell and some of his siblings purchased the land at issue in this lawsuit, which the family calls the North Place. Over the years, interest in the North Place transferred among family members. At the time of Wendell's death, Wendell owned a one-half interest in the North Place and several of his nieces and nephews owned the other half, with each owning an undivided one-sixth interest. This dispute all centers around how Wendell intended to dispose of his one-half interest in the North Place upon his death. Rodger asserts that Wendell wanted his interest to be shared between Rodger and his cousin Barbara Bartell, as evidenced by a transfer-on-death deed executed shortly before Wendell's death. Contrarily, Barbara contends that Wendell wanted his interest in the North Place to transfer to Barbara and her spouse—with no portion passing to Rodger—as evidenced by an earlier executed transfer-on-death deed.

The parties rely on dueling documents, so the facts surrounding the execution of these documents is important. Barbara and her spouse rely on an October 2013 transfer-on-death deed transferring the entirety of Wendell's interest in the North Place to Barbara and her spouse. Rodger relies on a transfer-on-death deed executed by Wendell in September 2018, a few weeks before his death, transferring his interest in the North Place to Rodger and Barbara. After Wendell's death, the cousins who owned the other half of the North Place—Robert Woodard, Claude Woodard Jr., and Gloria Ann Boyett—filed a partition action against Rodger and Barbara, alleging they each owned an undivided one-fourth interest in the North Place. In her answer to the partition action, Barbara admitted to all the allegations except that Rodger owned any interest in the North Place. Thereafter, Barbara and her husband, John Bartell, filed a separate action alleging that Rodger owned no interest in the North Place—specifically, the Bartells argued that the 2018 transfer-on-death deed was invalid, and that they should receive Wendell's one-half interest in the property under the 2013 deed. The district court consolidated the cases and, after an unsuccessful mediation, proceeded to trial.

Before trial, Rodger and the Bartells agreed that Robert Woodard, Claude Woodard Jr., and Gloria Boyett each owned an undivided one-sixth interest—that is, they equally shared the half interest in the North Place that Wendell did not own. The parties further agreed that Barbara Bartell owned an undivided one-fourth interest, either from the 2018 deed, if valid, or from the October 2013 deed. Rodger and Barbara's sole disagreement was whether Rodger or Barbara's husband, John Bartell, owned the other one-fourth interest in the North Place. That is, whether the 2018 transfer-on-death deed was valid.

Barbara challenged the validity of the 2018 transfer-on-death deed alleging Wendell lacked capacity to execute the document or that Rodger unduly influenced Wendell to achieve its execution. The district court, at a bench trial, heard testimony and evidence regarding the validity of the 2018 transfer-on-death deed, including testimony

from Rodger and his spouse; Barbara and her spouse; several family members; Wendell's former attorney; Wendell's physician; and the director of nursing at the long-term care facility where Wendell lived.

After suffering a fall in August 2018, Wendell moved to a long-term care nursing home until his death two months later. Wendell had a short stay in the same nursing facility earlier that year for a separate incident. Even at his advanced age, other than these two stays, Wendell primarily lived at home and took care of his own affairs. According to Rodger, shortly after entering the nursing facility for the second time, Wendell missed a payment on a utility bill and subsequently asked Rodger to help him "take care of his business." Along with being the primary contact person for the nursing home, Rodger also began paying Wendell's bills. Rodger testified that Wendell had "been telling me for years . . . he did not want his estate to go through probate," so while visiting Wendell on September 12 or 13, 2018, Rodger offered to check Wendell's documents to ensure all was in order and Wendell agreed. Rodger proceeded to examine Wendell's deeds and other holdings to make sure Wendell's assets each had a designated beneficiary and that any transferring deeds had the correct beneficiaries.

Upon checking the deeds, Rodger noticed that the October 2013 North Place transfer deed identified only Barbara and her spouse as the transferees upon Wendell's death. Rodger testified that he understood for years that he would inherit one-half of Wendell's interest in the property, and that his cousin, Barbara Bartell, would inherit the other half. Wendell's interest in the North Place was the subject to several deeds executed by Wendell over the years:

- On January 17, 2002, Wendell executed a transfer-on-death deed, drafted by attorney Paul Gregory, leaving his interest in the North Place to Rodger and his mother.

4

- On March 15, 2013, Wendell executed a transfer-on-death deed, drafted by Paul Gregory, leaving his interest in the North Place to Rodger and his wife.
- On October 29, 2013, Wendell executed another transfer-on-death deed, drafted by Paul Gregory, leaving his interest in the North Place to Barbara Bartell and her husband.
- Finally, on September 17, 2018, Wendell executed the final transfer-on-death deed, leaving his interest in the North Place to both Rodger and Barbara Bartell. As noted above, Rodger and his wife drafted this deed.

According to Rodger, several months after the execution of the March 2013 deed—which left the North Place to Rodger and his wife—Wendell told Rodger that he had changed his mind and drafted another deed leaving his interest in North Place to Rodger and his cousin Barbara Bartell. Rodger testified that Wendell said that although Barbara would share in the land, Rodger would have to bear the brunt of managing the property. Wendell executed the second 2013 deed leaving his North Place interest to Barbara and her spouse just six months after the prior deed. And contrary to Rodger's belief that new deed did not split the North Place interest between Rodger and Barbara, the new deed left the entirety to Barbara and her spouse.

Upon discovering the October 2013 North Place transfer-on-death deed, Rodger returned to the nursing home a day or two later and asked Wendell who he intended the property to pass to, and Wendell responded, "You and Barb[ara]." Rodger recalled that after explaining the effect of the October 2013 deed, Wendell was "not happy" with the situation and called it a "mistake." According to Rodger, Wendell wanted to correct the matter so that he and Barbara would share his interest in North Place equally. Rodger testified that "[t]here was no doubt in my mind that that's what he wanted to have done." Rodger said he called the attorney, Paul Gregory, who had drafted Wendell's prior deeds, but Gregory did not respond. Rather than wait to speak to Gregory, Rodger asked his

wife, who works as a legal secretary, to type up a new transfer-on-death deed for the North Place that would split Wendell's interest between Rodger and Barbara. Rodger also testified that Wendell agreed that Rodger could "fix this problem" and "[h]e 100 percent understood."

On September 17, 2018, Rodger returned to the nursing home with the transfer-on-death deed prepared by his wife. Rodger asked the director of nursing at the long-term care home, Rita McKeon, to serve as a notary. Because of Wendell's failing eyesight, Rodger read the deed aloud; Rodger recalled that Wendell seemed normal that afternoon and McKeon noted there was no documented mental issues that day in Wendell's chart. McKeon asked Wendell if he knew what he was signing, and Wendell responded that he did. According to Rodger, he asked Wendell if he understood the deed and confirmed with Wendell that his interest in the North Place would transfer to Rodger and Barbara upon Wendell's death. Wendell then signed the deed. Rodger and his dog then sat with Wendell and talked for several hours. Wendell died 20 days later.

Attorney Paul Gregory had drafted various documents for Wendell over the years. Gregory helped prepare Wendell's will in 1997 which named Rodger as the executor and primary beneficiary, in the event that Rodger's mother Phyllis predeceased Wendell. According to Gregory, his representation had mostly consisted of Wendell asking him to prepare deeds and other legal documents from time to time. Wendell did not share information with Gregory about his other assets and recalled that he did not do any work for Wendell between drafting of the two deeds in 2013 and filing Wendell's taxes in early 2018. Gregory testified that he was never asked to consult about the 2018 transfer-on-death deed and had no documentation that Rodger had tried to call him.

Two of Wendell's caregivers, Dr. Barbara Brown and nurse Rita McKeon, testified regarding his mental state in the last month of his life. Dr. Brown testified that she believed Wendell suffered from dementia because "he did not always make sense, and his

thought processes were not always correct." Dr. Brown explained that Wendell wanted to stop taking his medications because he wanted to die—which she believed was an indication of delusional thinking—because stopping his medication would have only increased his discomfort, not hastened his death. Dr. Brown also testified that Wendell had good long-term memory, but his short-term memory suffered. Despite her testimony that she believed Wendell likely suffered from dementia, Dr. Brown never included a dementia diagnosis or treatment plan in Wendell's medical record at the long-term nursing facility. Dr. Brown explained that Wendell suffered a head injury from a fall on September 14, 2018, that left him somewhat confused; she further opined that the fentanyl patches and morphine Wendell was taking could have interfered with his thought process—although she did not state that it did.

McKeon testified that Wendell retained his mental faculties and stayed in the self-care wing, not the dementia wing, of the facility. McKeon had more contact with Wendell in his final month of life than Dr. Brown did, and she disagreed with Dr. Brown's testimony, stating:

> "Wendell was, he would tell us what he was going to do, when he was going to do it. We allowed him to make his own decisions, as long as we felt like he was safe[,] and he would let us. His mind was very sharp."

McKeon testified that Wendell sometimes had "delusions" and "hallucinations" in the later part of the day and evenings, but there was never a diagnosis of dementia in his medical records, and he remained lucid until the end of his life. She also recalled that when she served as the notary for the 2018 transfer-on-death deed, Wendell stated that he understood what he was signing.

Wendell's family and friends also testified to his mental acuity and ability to communicate shortly before his death. Robert Woodard, one of Wendell's nephews,

7

visited with Wendell the day before he died and recalled that "he would come and go. . . . [H]e had . . . recognition, but then very quickly within a minute or two, he would forget what he was talking about . . . ." Edith Nesland, Wendell's niece and Barbara's sister, went to see Wendell two days before he died; although Wendell was weak and in pain, she remembered that he was able to hold a conversation and that he seemed cognizant of his surroundings. Finally, Sarah and Kenton LaRosh, who seasonally rented land from Wendell over the years, visited him in the long-term care facility every Sunday and they recalled that Wendell was coherent, responsive, understood what was said to him, and retained his good memory.

Some of these family members also recalled Wendell talking about how he wanted to pass his interest in the North Place. Edith Nesland spoke with Wendell about the North Place when she visited him two days before his death; she recalled that he told her that the North Place would pass to "you kids," which she understood to mean she and her siblings, of which Barbara is one. Robert Woodard testified that his uncle, Wendell, told him he was leaving his interest in the North Place to Barbara Bartell, without mention of her husband John Bartell. Barbara and John Bartell testified that Wendell had stated he was leaving his interest in the North Place to them, and Barbara testified that Wendell said nothing about sharing the land with Rodger. Robert Woodard recalled Wendell telling him that he was leaving a different piece of land to Rodger—so Robert was surprised Wendell included Rodger in the 2018 transfer-on-death deed of the North Place interest.

After hearing the evidence, the district court denied the Bartells' petition to invalidate the 2018 transfer-on-death deed and ordered Wendell's one-half interest in the North Place to be split equally between Rodger and Barbara. The court found the Bartells failed to establish Wendell lacked capacity to execute the 2018 transfer-on-death deed, and that although Rodger had a confidential, fiduciary relationship with Wendell—the

Bartells failed to show by clear and convincing evidence that suspicious circumstances existed to invalidate the deed.

The Bartells appealed.

DISCUSSION

As a preliminary matter, the Bartells do not challenge the district court's finding that Wendell had the required capacity to execute the 2018 transfer-on-death deed, and this court will not make any findings regarding that issue. Instead, the Bartells only appeal the district court's decision that they failed to present clear and convincing evidence that Wendell executed the 2018 transfer-on-death deed under suspicious circumstances. In support of their claim, the Bartells make two related arguments: (1) that they presented clear and convincing evidence of suspicious circumstances surrounding the execution of the 2018 transfer-on-death deed; and (2) that the substantial competent evidence they presented was sufficient to shift the burden of proof back to Rodger. These two arguments present only one issue for this court to decide—whether the district court arbitrarily disregarded undisputed evidence when it found that the Bartells failed to show suspicious circumstances, and thus undue influence, surrounding Wendell's execution of the 2018 transfer-on-death deed.

I.      *Establishing Undue Influence*

A person seeking to enforce a testamentary document such as a will or other document used to transfer a person's assets upon their death, in this case Rodger, must make a prima facie case establishing the document's validity. See *In re Estate of Farr*, 274 Kan. 51, 58-59, 49 P.3d 415 (2002). This merely requires the party to show that the document was executed in accordance with all required legal formalities, which is not in dispute here. Thereafter, any person contesting the validity of the document, in this case

the Bartells, can do so by establishing a presumption that the person who executed the document was subject to undue influence in the execution. Undue influence is "'such coercion, compulsion or constraint that the testator's free agency is destroyed,'" such that the testator is "'obliged to adopt the will of another rather than exercise his own.'" *Cresto v. Cresto*, 302 Kan. 820, 832, 358 P.3d 831 (2015). The Kansas Supreme Court has explained that not all influence is improper, and "influence obtained by kindness and affection will not be regarded as undue." *In re Estate of Ziegelmeier*, 224 Kan. 617, 622, 585 P.2d 974 (1978).

The contester can establish undue influence by showing that (1) the person who allegedly exerted undue influence was in a *confidential and fiduciary relationship* with the person who executed the document; and (2) there were *suspicious circumstances* surrounding the making of the document. If the contesting party successfully establishes a presumption of undue influence—the burden then shifts to the opposing party to rebut that presumption. *Cresto*, 302 Kan. at 834. Therefore, if the contesting party cannot establish a presumption of undue influence, the district court's review ends. The existence of power, motive, and opportunity to exercise undue influence will not, standing alone, substantiate the inference that this influence was exercised. *In re Estate of Farr*, 274 Kan. at 70-73.

Here, the district court found that Rodger established a prima facie case that the 2018 transfer-on-death was valid—after all, it is undisputed that Wendell actually signed the deed and it was properly filed. The burden then shifted to the Bartells to establish a presumption that Rodger unduly influenced Wendell in the execution of the deed. The district court agreed that Rodger was in a confidential and fiduciary relationship with Wendell—finding the Bartells met the first step in the undue influence test delineated in *Cresto*. However, the district court found the Bartells failed to present clear and convincing evidence of suspicious circumstances, thus failing to meet the second step of the test and overcome the presumption of validity. As a mostly academic matter, this

10

court notes that the district court did not state on the record that it made the ultimate, dispositive finding that the Bartells failed to prove undue influence in the execution of the deed. Rather, the court found that the Bartells failed to overcome the presumption of validity and then denied their request to invalidate the 2018 transfer-on-death deed and ordered that the one-half interest in the North Place owned by Wendell Woodard be transferred upon his death with one-half interest to Barbara Bartell and one-half interest to Rodger Hendrix. The court's findings and actions demonstrate its intent, and this court can infer the district court found all necessary facts and findings to support its judgment. See Supreme Court Rule 165(b) (2022 Kan. S. Ct. R. at 234); *State v. Dern*, 303 Kan. 384, 394, 362 P.3d 566 (2015).

II.     *The Standard of Review*

This court is charged with reviewing district court decisions within the bounds of the applicable standard of review for a given matter. While an intermediate court of appeals such as this one is never a fact-finder—the court's review method and standards change depending on the type of case or question before it. Some methods of review permit this court to review the factual findings and legal determination anew, while others limit review to a determination of whether the district court acted arbitrarily. In a unique application, the Kansas Supreme Court has set forth an even more deferential standard of review for cases, such as this one, when this court reviews a district court's negative factual findings. "[L]imitations on a person's ability to disprove a negative dictate a special standard of review" when the district court makes a negative fact finding. *Cresto*, 302 Kan. at 845. In such an instance, this court can only reverse the district court's negative factual findings if it finds the district court arbitrarily disregarded undisputed evidence or that it acted out of bias, passion, or prejudice. *In re Estate of Farr*, 274 Kan. at 69-70; *In re Estate of Haneberg*, 270 Kan. 365, 374, 14 P.3d 1088 (2000).

11

Although elusive, this court endeavors an explanation of the extraordinarily deferential standard because it is salient to the resolution of this case. The first step in this explanation requires an understanding of how and when a negative finding of fact occurs. When the district court finds that a party who retains the burden of proof fails to meet that burden—that is a negative fact finding. This is contrasted when the district court finds that a party without the burden proves a disputed fact upon which the case hinges. See *In re Estate of Haneberg*, 270 Kan. at 374 (defining a negative fact finding). In both instances however, the district court comes to the same factual conclusion. Here, according to the district court, the Bartells failed to prove that suspicious circumstances existed surrounding the execution of the 2018 transfer-on-death deed—thus creating a negative fact finding. However, does that not also mean that Rodger showed suspicious circumstances did not exist? When, as here, the district court relies on evidence presented by both parties to make a finding, it is difficult to understand the necessity or relevance in labeling such finding a "negative" and thus triggering an almost insurmountable standard of review.

Nonetheless, this court is bound by the Kansas Supreme Court precedent and does not undertake to change the application in this case, but to explain that the applicable standard of review constrains this court and leaves the Bartells with limited recourse. Rather than determining whether the district court's decision was based on substantial competent evidence—this court must determine only if the district court arbitrarily disregarded or ignored undisputed evidence. The Bartells do not allege that the district court's ruling stemmed from bias, passion, or prejudice—and this court finds none. In conducting this review, this court "'cannot nullify [the] trial judge's disbelief of evidence nor can it determine the persuasiveness of evidence which the trial judge may have believed.'" *Cresto*, 302 Kan. at 845. In fact, this court cannot reverse the district court for ignoring disputed evidence or even ignoring undisputed evidence—unless that act was arbitrary.

III.    *The district court did not ignore undisputed evidence.*

To overcome the deferential standard of review, the Bartells claim that the district court ignored undisputed evidence by essentially arguing the sufficiency and weight of evidence in their favor. However, the record is clear that the district court considered the Bartells' evidence—but was just unpersuaded by it or more persuaded by other evidence.

The Bartells argue the district court arbitrarily ignored the following:

- evidence of Wendell's fragile mental and physical state;
- evidence that Wendell did not have independent legal counsel to assist him;
- evidence that Rodger, the deed beneficiary, and his wife drafted the deed; and
- evidence of Wendell's intention to leave North Place to Barbara.

Contrary to the Bartells' contentions, the cited evidence is not all undisputed—and more importantly—it was not ignored by the district court.

a.    *The district court considered Wendell's cognitive ability.*

The Bartells claim the district court disregarded Dr. Brown's testimony about Wendell's health in his final months. Contrary to their contention—the district court noted Dr. Brown's testimony as well as nurse McKeon's testimony and concluded that Wendell was experiencing some cognitive issues but most of the testimony suggested that he was able to understand the transfer-on-death deed. The court also found that although Dr. Brown testified that Wendell's pain medication could have affected his cognitive ability—there was no evidence or testimony that it did in fact have such an effect. Finally, the court noted that nurse McKeon did not believe Wendell suffered from dementia and gave nurse McKeon's opinion more weight. After examining all of the exhibits, which included medical records and notes, the district court found just one

13

reference to a dementia diagnosis (found in Dr. Brown's note), and the records from the nursing home described Wendell as being alert and oriented most of the time.

The Bartells also argue that the district court ignored evidence that Wendell fell and injured his head just three days before executing the transfer-on-death deed, and Dr. Brown noted that the injury left Wendell physically weak and confused. But the district court addressed this head injury and explained that Wendell had spoken with Rodger about executing a new deed for the North Place two days before the fall. The court found this fact cut against the argument that his fall and condition on the day he executed the deed demonstrated suspicious circumstances. The Bartells argue that the district court misjudged the evidence and should have given Dr. Brown's opinion more weight than it did—but that is not a determination this court can make. Wendell's cognitive ability at the time of the execution of the transfer-on-death deed is somewhat disputed, and the district court made credibility determinations and findings after considering the evidence, which it thoroughly explained. This court cannot reweigh the conflicting evidence and reassess the witness credibility. See *Cresto*, 302 Kan at 835.

b. *The district court considered Wendell's lack of independent legal counsel.*

The Bartells argue that suspicious circumstances exist because Wendell did not have independent counsel prepare the 2018 transfer-on-death deed. But the district court addressed the Bartells' argument in its ruling. Gregory, the attorney who had drafted deeds for Wendell in the past, explained that he never provided Wendell with comprehensive estate planning services or legal advice, and he primarily drafted the legal documents that Wendell requested. The district court also explained that Rodger and his wife's preparation of the deed did not create suspicious circumstances because she was performing a similar service to what Gregory typically performed—preparation of a simple, legal document at Wendell's request. The Bartells seem to argue that the district

14

court did not give the lack of independent counsel enough weight. Once again, this court cannot reweigh this evidence or reassess witness credibility. See *Cresto*, 302 Kan at 835.

While independent counsel could be beneficial and appropriate under the circumstances, this court cannot say the district court arbitrarily disregarded Wendell's lack of independent counsel. Although the district court could have viewed Rodger's wife's preparation of the deed as suspicious, that fact is not necessarily nefarious. See *In re Estate of Moore*, 310 Kan. 557, 568, 448 P.3d 425 (2019) ("Although such practice invites scrutiny, the law does not forbid a party from benefiting from a conveyance that the party helped to craft."). Regardless, the district court clearly considered this evidence and exercised its judgment to determine that Wendell's lack of independent counsel and Rodger's role in drafting the deed did not constitute clear and convincing evidence of suspicious circumstances.

c. *The district court considered Rodger's influence and Wendell's intent.*

The Bartells argue that the district court simply disregarded Rodger's self-dealing and influence over Wendell and ignored testimony that Wendell intended for the North Place to pass entirely to Barbara. Yet again, the district court did not ignore undisputed facts. The district court noted that Wendell's estate plan favored Rodger in much of the property distribution, he was the sole beneficiary of Wendell's will, and he was given other property. Then the district court heard somewhat contradictory testimony from two other cousins about Wendell's intent for the North Place. Cousin Robert Woodard testified that Wendell told him in 2013 that he was leaving the North Place to Barbara. While cousin Edith Nesland stated that Wendell told her that he was leaving North Place to "you kids," and he did not mention Rodger. But there was also testimony from Rodger and other evidence about Wendell's intent that the district court found credible.

15

The district court explained the evidence and its findings about Wendell's intent for the North Place:

"Now, there was testimony from . . . Edith that quite some time ago, and I believe it was back in 1988, . . . Wendell had told her something to the effect that Wendell would make sure that your family gets her dad's inheritance. So back in 1988, Wendell had expressed his desire that Barb and her family would get her father's interest.

"There has been other testimony that the interest that her father had owned in the North Place was a quarter interest. So it would make sense then that Wendell intended that Barb get a quarter interest. Edith also testified to the effect that Wendell had told him that Barb would share this with the siblings, which is consistent with the note that Wendell had written to Barb when he sent her the October 2013 deed. So those are consistent, that he wanted to give it to Barb, and have her share it with her siblings.

"But that doesn't show by clear and convincing evidence that Wendell wanted her to have the whole thing. I think it could be very well surmised that Wendell had intended that Barb get her father's interest, which was one-fourth, which would be half of Wendell's half. . . . [T]here is no good explanation about why Wendell changed the deeds in 2013, other than that he had been intending that Rodger get half of his half, and Barb get half of his half.

"Rodger has testified that Wendell had been telling him for years that that's the way it would be. Rodger would get half, Barb would get half, meaning each of them a fourth. . . .

. . . .

"I think that the evidence is consistent that Wendell did want one-fourth to go to Barb, one-fourth to go to Rodger, and we have to keep in mind that the burden of proof is clear and convincing evidence of suspicious circumstances. In these circumstances, we had the very clear estate plan that Rodger was favored in all of the property, and had been favored, and had been the one who would receive all of the North Place until the October

29th, 2013, deed. Again, there has been no explanation about why there would be the change from only Rodger to only Barb.

> "Consistent with what Wendell had told Rodger, and consistent with what Wendell told Edith, and consistent with what Wendell had told Rodger in September of 2018, Wendell wanted the North Place to go one-half to Rodger and one-half to Barb."

Again, this court will not second guess how the district court weighed evidence or assessed witness credibility. *Cresto*, 302 Kan. at 835. Just as in the other instances, the Bartells' allegations stem from a disagreement with the district court's analysis and determination rather than a showing the district court arbitrarily disregarded undisputed evidence.

## CONCLUSION

The district court determined that the Bartells failed to meet their burden to establish, by clear and convincing evidence, that Rodger exercised undue influence over Wendell in the execution of the 2018 transfer-on-death deed. On appeal, the Bartells have a nearly insurmountable burden to show that the district court arbitrarily disregarded undisputed evidence or relied on bias, passion, or prejudice in making that decision. The district court's explanation of its ruling demonstrates that it considered all of the evidence and did not arbitrarily disregard undisputed evidence in reaching that conclusion. Although some of the facts here could be suspicious—that alone cannot overcome the deference afforded the district court's negative fact finding. The district court's decision is affirmed.

Affirmed.

17

ATCHESON, J., concurring: I concur in the result the majority reaches in affirming the Osborne County District Court's judgment finding Wendell Woodard willingly signed a deed shortly before his death in 2018 granting his interest in a tract of land to his nephew Rodger E. Hendrix and his niece Barbara Bartell, thereby supplanting a deed from five years before granting the interest to Bartell and her husband. The district court so ruled at the end of a two-day bench trial that focused on Woodard's legal capacity and whether Hendrix unduly influenced him. The Bartells have appealed only the adverse ruling on their undue influence claim. The district court made key credibility findings favoring Hendrix that we must respect on appeal, and those determinations effectively resolve this appeal in Hendrix's favor.

The case comes to us in an odd procedural posture, shaped in part by the district court's ruling and in part by the limited issue raised on appeal. The district court never explicitly ruled on undue influence but, rather, held the Bartells had not presented sufficient evidence to trigger a presumption of undue influence. I briefly explain my take on why we can and should affirm the district court on the ultimate issue anyway.

I then turn to the rule governing appellate review of "negative" findings of fact in bench trials. Both sides discussed the rule in their briefs, and the majority applies it with some reservation. I amplify on that critique of the negative findings standard. The rule appears to be unique to Kansas and, at least for civil cases, conflicts with the statutory standard of review mandated in K.S.A. 2021 Supp. 60-252(a)(5). Moreover, it serves no practical or logical purpose and seems to derive from the unexamined repetition of what amounts to a misstatement of law.

*District Court Findings Permit Review on Appeal*

The Kansas Supreme Court has recognized a presumption of undue influence arises with respect to testamentary instruments, presumably including the 2018 transfer-on-death deed, when a party challenging the document presents clear and convincing evidence establishing the grantor and grantee had a fiduciary or confidential relationship and the disposition of the property displays suspicious circumstances. *Cresto v. Cresto*, 302 Kan. 820, 833-34, 358 P.3d 831 (2015). If established, the presumption shifts the burden of proof on undue influence from the party challenging the testamentary instrument to its proponent. In other words, without the presumption, the challenger would have to prove undue influence. But in the face of the presumption, the proponent of the instrument would have to prove the absence of undue influence. 302 Kan. at 834.

Proving the presumption, however, is not a necessary condition for establishing undue influence. A party challenging a testamentary instrument as the product of undue influence can do so successfully without showing or relying on the common-law presumption. That typically would be true when the circumstances evince coercive overreaching or untoward insinuation but no confidential or fiduciary relationship. So the failure of the challenging party to establish the twin components of the evidentiary presumption of undue influence is not itself legally dispositive. And that's the wrinkle in this case.

At the conclusion of its exceptionally detailed bench ruling (later incorporated by reference into the journal entry of judgment), the district court found the Bartells had failed to prove a presumption of undue influence because they did not present clear and convincing evidence of suspicious circumstances. The district court then ordered judgment for Hendrix, thus finding the 2018 deed to be valid and enforceable. But the district court never explicitly found the 2018 deed was not the product of undue

19

influence—the ultimate issue bearing on what real property interests transferred to whom. Although that omission may be untidy, it does not derail our resolution of this appeal.

Appellate courts may presume a district court has made the requisite findings to support its judgment when one or more findings have not been recited in the record and the omitted findings are consistent with the stated findings. See *Dragon v. Vanguard Industries, Inc.*, 282 Kan. 349, 356, 144 P.3d 1249 (2006); *Wing v. City of Edwardsville*, 51 Kan. App. 2d 58, 69, 341 P.3d 607 (2014). The rule takes on particular force if the parties voice no contemporaneous objection to the findings. *Dragon*, 282 Kan. at 358. Here, at the conclusion of its bench ruling, the district court specifically asked the lawyers if they had questions (or, presumably, concerns) about the decision. Neither lawyer sought any clarification or expansion of the findings or ruling. Likewise, the lawyers signed off on a journal entry incorporating the bench ruling without elaboration.

In addition, the district court's finding the Bartells did not prove sufficient suspicious circumstances to invoke the presumption of undue influence is entirely compatible with an ultimate conclusion that Hendrix did not improperly induce Woodward to sign the 2018 deed. The absence of suspicion surrounding the drafting and signing of the instrument would itself be circumstantial evidence cutting against undue influence. By the same token, suspicious circumstances would be indirect and often strong evidence of undue influence, since the two dovetail. See *Cresto*, 302 Kan. at 833-34.

On appeal, the Bartells challenge only the district court's ruling they failed to prove suspicious circumstances that would trigger the presumption of undue influence arising from the confidential relationship Hendrix maintained with Woodward. Their present fight, therefore, is confined to the district court's failure to invoke the presumption of undue influence. We may consider that point without an explicit finding from the district court on the ultimate issue of undue influence.

20

If the Bartells were correct, then the case would have to be remanded for the district court to apply the presumption and reconsider the record evidence based on the resulting shift in the burden of proof on undue influence. But, as the majority lays out, the evidence supports the district court's conclusion that the Bartells failed to prove facts triggering the presumption. Their appeal on that point fails, and they have not otherwise challenged the judgment in favor of Hendrix. We may, therefore, properly affirm the district court.

*Standard of Review for "Negative Findings"*

The Kansas appellate courts have routinely, if almost invariably briefly, stated the rule for reviewing a so-called "negative" finding of fact this way: When, in a bench trial, a district court finds the party bearing the burden of proof fails to satisfy that burden, the result is a negative finding that may be reversed on appeal only if the district court arbitrarily disregarded undisputed evidence to the contrary or otherwise ruled based on bias, passion, prejudice, or some similarly improper extrinsic consideration. *In re Tax Appeal of River Rock Energy Co.*, 313 Kan. 936, 959, 492 P.3d 1157 (2021); *Wiles v. American Family Assurance Co.*, 302 Kan. 66, 79-80, 350 P.3d 1071 (2015); *Lostutter v. Estate of Larkin*, 235 Kan. 154, 162-63, 679 P.2d 181 (1984) (reciting rule and characterizing standards for reviewing district court findings to be "too familiar to require citation of authority"). By contrast, a "positive" finding—the district court's conclusion that the party with the burden of proof has met that burden—will be reviewed and affirmed if supported by "substantial competent evidence." *Gannon v. State*, 309 Kan. 1185, 1192, 443 P.3d 294 (2019); *Lostutter*, 235 Kan. at 162; *Stormont-Vail Healthcare v. Board of Shawnee County Comm'rs*, 59 Kan. App. 2d 148, 153, 480 P.3d 184 (2020). In making that determination, the appellate court disregards the evidence conflicting with the district court's finding. The two standards are different, and the negative findings standard is distinctly more formidable to overcome on appeal. See *Lostutter,* 235 Kan.

21

at 162-63; *In re Estate of Ramsey*, No. 121,624, 2020 WL 3579783, at \*4-5 (Kan. App. 2020) (unpublished opinion).

Here, both the Bartells and Hendrix characterize the district court's ruling that the presumption of undue influence does not apply as one reviewed under the negative findings standard. For purposes of the immediate discussion, I assume they are correct and examine the underpinnings of the negative findings rule. (As I have explained, the Bartells' failure to establish the presumption is not itself legally determinative of their undue influence claim. Whether the negative findings rule would extend to that sort of subsidiary factual determination is beside the point for purposes of my examination of the rule's soundness.)

So why are there two standards, depending on the judgment? A district court applies a single set of criteria to sift the evidence, thereby resolving conflicts and sorting the credible from the questionable to arrive at a reasoned account of the relevant historical facts. Based on that sifting, the district court declares whether the credited evidence satisfies the required burden of proof or falls short of that measure as to the elements defining the disputed legal claims. The result of that process controls the outcome in the form of a judgment for one party or the other. And the process is the same regardless of the outcome. Logically, then, our review of the district court's process shouldn't vary because of the result.

This case, with its presumptions and shifting burdens, tends to mask the illogic of dual standards of review. Let me offer a more straightforward example:  John Doe sues Susan Roe for personal injuries arising from a motor vehicle collision. The issue is which driver had the green light at a controlled intersection. Plaintiff Doe says he did. Defendant Roe is quite sure she did. A witness at the corner says the light was green for Doe. But the witness admits to being distracted because he was reviewing text messages on his smartphone. Roe's 10-year-old daughter, who was a passenger in the car, testifies

22

at trial her mother had a green light. But she told the investigating officer at the scene that the light was yellow when she first saw it and then red. Doe has been convicted of several crimes of dishonesty. The case was tried to the district court without a jury. (Doe's decision to waive a jury seems ill-advised. But this is a civil procedure hypothetical, not a trial practice hypothetical.)

If the district court judge found the light were green for Doe and, thus, that he had proved by a preponderance of the evidence that Roe was negligent, the finding would be a "positive" one. We would review that determination for substantial competent evidence, and Doe's testimony would satisfy that burden. But if the district court judge found the light were green for Roe and thus rendered a "negative" finding that Doe failed to meet his burden of proof, we would review that determination only for an arbitrary disregard of undisputed evidence or some improper external influence on the judge. The outcome, however, turns on the credibility contest between Doe and Roe—functionally a single determination by the district court judge as to a controlling historical fact. No good reason suggests differing standards for reviewing that decision depending on which party was found credible.

Indeed, the Kansas Code of Civil Procedure dictates a single standard of appellate review for a district court's findings of fact in a bench trial: They may be set aside only if they are "clearly erroneous." K.S.A. 2021 Supp. 60-252(a)(5) ("Findings of fact must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witness' credibility."). The negative findings rule conflicts with K.S.A. 2021 Supp. 60-252(a)(5), so its very existence, at least in civil actions, is doubtful. See *Stanley v. Sullivan*, 300 Kan. 1015, Syl. ¶ 1, 336 P.3d 870 (2014) ("statutory enactments supersede the common-law"); *Club Exchange Corp. v. Searing*, 222 Kan. 659, 664-65, 567 P.2d 1353 (1977) (rules of civil procedure in K.S.A. 60-222 governing interpleader displace stricter common-law requirements). In short, under K.S.A. 2021 Supp. 60-252(a)(5), "negative" findings of fact and "positive" findings of

23

fact should be reviewed on appeal using the same standard. For what it's worth, the Kansas Supreme Court has indicated that a substantial evidence standard and a clearly erroneous standard are likely equivalent measures. See *Weber v. Tillman*, 259 Kan. 457, 461-62, 913 P.3d 84 (1996).

The clearly erroneous statutory standard should govern appellate review of the judgment in *Doe v. Roe* regardless of who prevailed. Similarly, the standard ought to apply when a defendant presents no evidence but undermines the credibility of plaintiff's evidence in the eyes of the district court, resulting in a defense judgment that would rest on a so-called "negative" finding.

The Federal Rules of Civil Procedure apply a clearly erroneous standard to appellate review of a district court's findings of fact made in a bench trial. Fed. R. Civ. Proc. 52(a)(6). The federal courts draw no distinction between so-called negative findings and positive findings. See, e.g., *PlayNations Play Systems, Inc. v. Velex Corporation*, 924 F.3d 1159, 1165 (11th Cir. 2019) (appellate court reviews factual findings supporting district court's judgment for plaintiff following bench trial under clearly erroneous standard); *Radiance Capital Receivables Eighteen, LLC v. Concannon*, 920 F.3d 552, 559 (8th Cir. 2019) (clearly erroneous standard applied to factual findings of district court in entering judgment for plaintiff following bench trial); *Kaplan v. Mayo Clinic*, 847 F.3d 988, 991 (8th Cir. 2017) (appellate court reviews findings of fact under clearly erroneous standard when district court enters judgment for defendant on breach of contract claim following bench trial); *T. Marzetti Co. v. Roskam Baking Co.*, 680 F.3d 629, 633 (6th Cir. 2012) (clearly erroneous standard applied to findings of fact supporting defense judgment following bench trial). In short, in the federal courts, one standard of appellate review governs whether or not the party bearing the burden of proof prevailed in a bench trial.

Based on a reasonably diligent search, I could find no other state that uses a negative findings standard like ours. Given what appears to be its origins in Kansas law,

24

I'm not surprised. The Texas appellate courts often refer to "negative findings," when a party fails to carry the assigned burden of proof on an issue. But the courts review a challenge to that sort of determination using a clearly erroneous standard—the outcome must be against the great weight of the evidence. See *Meyers v. 8007 Burnet Holdings, LLC*, 600 S.W.3d 412, 425 (Tex. App. 2020); *Cartwright v. Amendariz*, 583 S.W.3d 798, 803 (Tex. App. 2019), see also *Velvet Snout, LLC v. Sharp*, 441 S.W.3d 448, 450-51 (Tex. App. 2014) (recognizing and applying standard in reviewing factual findings in bench trial); *In re B.F.*, No. 07-16-00282-CV, 2017 WL 1173809, at *4 (Tex. App. 2017) (unpublished opinion) (same). Under Texas law, an appellate court applies the same standard whether it's reviewing a negative or affirmative factual finding and regardless of which party had the burden of proof at trial. *M.D. Anderson Hosp. and Tumor Institute v. Felter*, 837 S.W.2d 245, 247 (Tex. App. 1992); *In re B.F.*, 2017 WL 1173809, at *4.

The absence of any jurisdiction allied with Kansas necessarily makes the negative findings rule idiosyncratic. Although idiosyncrasy is not synonymous with bad or ill-conceived when it comes to common-law doctrine, the failure of a longstanding rule or approach to garner additional adherents might suggest functional or conceptual shortcomings and possibly both. See *Herington v. City of Wichita*, 59 Kan. App. 2d 91, 108, 479 P.3d 482 (2020) (Atcheson, J., concurring) ("If a court sets about inventing a better common-law mousetrap, other courts figuratively ought to beat a path to the courthouse door."), *rev'd* 314 Kan. 447, 465, 500 P.3d 1168 (2021). I would put the negative findings rule in the laced-with-shortcomings category.

The apparent origin story for the negative findings rule also raises legitimate concerns about its legal soundness. The present formulation of the rule appears in a mere two paragraphs at the end of *In re Estate of Countryman*, 208 Kan. 816, 822, 494 P.2d 1163 (1972). It is quite arguably dicta and is neither explained nor otherwise discussed in detail. The particular issue in *Estate of Countryman* turned on the existence of an oral contract to transfer an interest in real property. Following a bench trial, the district court

held the plaintiff failed to prove a contract and, even if she had, her claim was barred by the governing statute of limitations. The Kansas Supreme Court affirmed on both of those bases. The statute of limitations defense alone was sufficient and likely the narrower ground, rendering the insufficiency of the evidence argument superfluous and its discussion dicta. 208 Kan. at 822.

The *Estate of Countryman* court characterized the plaintiff's failure to prove the contract "a negative finding of fact in its purest form" and stated such findings could be upended on appeal only if they "were the result of 'arbitrary and capricious disregard of undisputed evidence or some extrinsic consideration such as bias, passion or prejudice.'" 208 Kan. at 822 (quoting *American Housing & Investment Co. v. Stanley Furniture Co.*, 202 Kan. 344, Syl. ¶ 1, 449 P.2d 561 [1969]). But the quoted syllabus point from *American Housing* purports to state a rule for discarding a *jury verdict* in a civil action. And the point ties the standard to otherwise valid credibility determinations the jurors have collectively reached in their deliberations after evaluating conflicting trial evidence. 202 Kan. 344, Syl. ¶ 1 ("Appellate courts cannot nullify a jury's disbelief of evidence nor can they determine the persuasiveness of testimony which a jury may have believed."). Although the syllabus draws a distinction between negative findings and positive findings of a jury, the text of the *American Housing* opinion does not. 202 Kan. at 346-47. The court noted the verdict was for the defendant and, thus, a negative one in the sense the plaintiff failed to meet its burden of proof. But the opinion does not suggest that affected the standard of appellate review.

The opinion itself stands for the unremarkable proposition that a jury verdict should be upheld if some trial evidence, though disputed, supports the verdict, since an appellate court should not look behind the jury's credibility determinations. Conversely, the verdict may be suspect on appeal if the jurors appear to have "arbitrar[ily] or capricious[ly]" disregarded uncontroverted evidence on a material issue or have been influenced by an "extrinsic consideration such as bias, passion or prejudice." 202 Kan. at

26

346-47. The *American Housing* opinion, then, recognizes and relies on the commonplace principle giving especially strong deference to the fact-finder's assessment of witness credibility. See *State v. Franco*, 49 Kan. App. 2d 924, 936-37, 319 P.3d 551 (2014) (jurors' assessment of witness credibility); *In re Guardianship and Conservatorship of L.M.H.*, No. 108,297, 2013 WL 2395900, at *6 (Kan. App. 2013) (unpublished opinion) (district court's assessment of witness credibility). The fact-finder's ability to see the witnesses and observe their demeanor as they testify, particularly on cross-examination, forms a key part of the evaluation that cannot be replicated in an appellate review of a trial transcript. See *Donnelly v. United States*, 228 U.S. 243, 273, 33 S. Ct. 449, 57 L. Ed. 820 (1913) (hearsay excluded as evidence in part because fact-finder lacks opportunity "to observe the demeanor and temperament" of declarant testifying in court—characterized as one of the "most important safeguards of the truth"); *State v. Letterman*, 60 Kan. App. 2d 222, 225, 492 P.3d 1196 (2021); 5 C.J.S. Appeal and Error § 930.

From the text of *American Housing* to the syllabus, those general propositions morphed into a test for reviewing a "negative" jury verdict, typically one for a defendant in a civil case. In turn, the *American Housing* syllabus became the foundation of the general negative finding rule for bench trials articulated (but never really explained) in *Estate of Countryman*—a rule divorced from and extending well beyond the historical and sound deference accorded credibility determinations. The rule, thus rendered, has been routinely invoked by rote for the past half century.

As a result, we now have dual standards for reviewing judgments in bench trials depending on whether the outcome favors the party bearing the burden of proof or the opposing party. The bifurcation itself rests on no readily apparent evidentiary considerations, and the "negative" finding standard imposes an exceptionally stringent barrier for reversal—demonstrably more formidable than the one for a positive finding—without any obvious policy justification. The rule, thus, appears to be an invention of inadvertence. It grows out of several casual and unstudied recitations that substantially

27

alter a recognized proposition applicable to credibility findings generally to create a much broader and more demanding rule for review of a bench trial judgment against the party bearing the burden of proof. A longer historical examination suggests as much.

In *Estate of Countryman*, the court also cites *Schroeder v. Richardson*, 196 Kan. 363, Syl. ¶ 6, 411 P.2d 670 (1966), another appeal from a jury trial, that parallels *American Housing* and is the lone authority identified in *American Housing*. 208 Kan. at 822. Finally, the court refers to an earlier appeal involving Countryman's estate and its discussion of the limited appellate review of credibility determinations. 208 Kan. at 822 (citing *In re Estate of Countryman*, 203 Kan. 731, 739, 457 P.2d 53 [1969]). The earlier opinion recited the narrow scope of review for credibility determinations in the context of a "negative" finding without noting the credibility review would be the same for a "positive" finding. That was true before the litigation over Countryman's estate and continues to be true now. See *In re F.C.*, 313 Kan. 31, 41, 482 P.3d 1137 (2021); *Killough v. Swift & Co. Fertilizer Works*, 154 Kan. 113, 117, 114 P.2d 831 (1941).

For some reason, the Kansas appellate courts have had a persistent if jurisprudentially peculiar fascination with "negative" findings made in bench trials. See *In re Estate of Johnson*, 155 Kan. 437, 439-40, 125 P.2d 352 (1942); *Potts v. McDonald*, 146 Kan. 366, 369-72, 69 P.2d 685 (1937). Those cases give the district court's conclusion that a party has failed to satisfy its burden of proof almost mystical force, especially in contrast to a converse positive finding on the same issue. As a result, the "negative finding" label has become a judicial shibboleth dooming an appellant to virtually certain defeat. To be sure, an appellant challenging a district court's "positive" finding the opposing party has satisfied its burden faces a difficult, though less formidable, task.

As I have said, there seems to be no analytical justification for the differing standards. The run of appellate opinions discussing negative findings rely on the

28

deference due credibility determinations of a district court sitting as the finder of fact. See *Collins v. Merrick*, 202 Kan. 276, 279-80, 448 P.2d 1 (1968); *In re Estate of Winter*, 192 Kan. 518, 522-24, 389 P.2d 818 (1964); *Potts*, 146 Kan. at 370-72. But that deference is due whether the credited witnesses advance the case for the party with the burden of proof or undermine that case by negating an essential element of the claim. Either way, an appellate court has almost no latitude to reject a district court's express credibility determination.

In *Potts*, the court provided one of the earliest and most detailed explanations of the notion of a negative factual finding. 146 Kan. at 370-71. Many later cases simply quote from or merely cite earlier cases. So *Potts* is a direct lineal ancestor of *Estate of Countryman*, 208 Kan. at 822, by way of *Schroeder*, 196 Kan. at 369-70 (citing *Potts*), and by way of the earlier *Estate of Countryman* opinion, 203 Kan. at 739 (citing *Collins*, citing *Estate of Johnson*, in turn citing *Potts*).

The *Potts* court relied on the standards deferring to a district court's credibility determinations to affirm a ruling that the plaintiff had failed to prove both an oral contract and his performance of what would have been its terms—plainly "negative" findings. But the court did not recognize or fashion a rule of appellate review giving heightened deference to the ultimate ruling *because* the party with the burden of proof failed to carry that burden. The affirmance turned on why the plaintiff failed:  Because the district court found his key witnesses to be less than persuasive in their accounts of the controlling facts. 146 Kan. at 372. The *Potts* court, then, presumably would have accorded the same deference had the district court found plaintiff's witnesses to be credible. Nothing in the opinion suggests otherwise. Later cases specifically discussing negative findings were essentially to the same effect, typically turning on credibility calls made in the district court—at least until *Estate of Countryman*, 208 Kan. at 822.

There, as I have outlined, the court recited a truncated version of the negative findings rule that leaves out its foundation in controlling credibility determinations. The court did so without explanation and for no apparent reason. The clipped rule in *Estate of Countryman* is more demanding of an appellant and has become the common pronouncement through sheer repetition rather than superior merit. The use of differing rules for review of so-called positive and negative findings lacks any sound justification and conflicts with K.S.A. 2021 Supp. 60-252(a)(5). We should follow the statute and really are obligated to do so.

My comments about the negative findings rule in no way diminish the importance of or the parties' fundamental right to a district court acting free of bias, prejudice, or personal interest. A judgment rendered in a bench trial because of bias, prejudice, or some similar external consideration influencing the district court must be considered improper—it would be, in a word, corrupt. That sort of contamination of the judicial process, if proved, presents a freestanding ground for reversal. See *Caperton v. A.T. Massey Coal Co., Inc.*, 556 U.S. 868, 876, 129 S. Ct. 2252, 173 L. Ed. 2d 1208 (2009) ("It is axiomatic that '[a] fair trial in a fair tribunal is a basic requirement of due process.'") (quoting *In re Murchison*, 349 U.S. 133, 136, 75 S. Ct. 623, 99 L. Ed. 2d 942 [1955]); *State v. Sawyer*, 297 Kan. 902, 910, 305 P.3d 608 (2013) ("mere heightened risk of actual bias" on district court's part "could lead to unacceptable peril to due process").

Even if we were to jettison the negative findings rule here, the result would be the same. The district court's credibility determinations favoring Hendrix provide substantial evidence (and then some) supporting the validity of the 2018 deed. We, therefore, are obligated to affirm the judgment.